[No. E000512. Fourth Dist., Div. Two. June 4, 1986.]

ARTHUR MILIAN, Plaintiff, Cross-defendant and Appellant, v.
SYLVIA ANN SANCHEZ DE LEON,
Defendant, Cross-complainant and Respondent.

## COUNSEL

Fullerton & Lemann, Wilfrid C. Lemann and Robert V. Fullerton for Plaintiff, Cross-defendant and Appellant.

LeMoyne S. Badger for Defendant, Cross-complainant and Respondent.

## OPINION

**KAUFMAN, J.**—Plaintiff and cross-defendant Arthur Milian appeals from an interlocutory judgment of partition, in which the trial court ordered

certain property sold and the net proceeds of sale divided equally between Milian and his co-owner, defendant and cross-complainant Sylvia Ann Sanchez De Leon (Sanchez). On appeal, Milian contends the court prejudicially erred in applying *Marvin* v. *Marvin* (1976) 18 Cal.3d 660 [134 Cal.Rptr. 815, 557 P.2d 106] to the circumstances of this case. Alternatively, he urges the court's finding of an implied contract between the parties for equal ownership and equal division of the property was not supported by substantial evidence. Finally, Milian requests, in the event the matter is reversed and remanded, that we issue directions to the trial court concerning the calculation of credits claimed to be due him in the accounting he asserts is required and in respect to disposition of the personal property in dispute.

*Facts*

Milian and Sanchez began dating in 1970. Their relationship continued for eight years but ended without marriage. Sanchez testified the two became engaged in 1976 and set a marriage date for approximately one year later. According to Sanchez, Milian often referred to her as his fiancee when they were together with others socially. Sanchez stated repeatedly at trial that the couple's sharing of financial resources during their dating relationship proceeded upon the shared contemplation that the two would eventually marry.

Milian denied ever proposing marriage or otherwise discussing plans to get married. Milian stated he asked Sanchez to live with him in order to discover whether the relationship was "going to work out or not." Sanchez, however, refused to live with him outside of marriage.

In late 1977, the couple jointly purchased a house which is the subject real property in the partition action. They shopped for the house together; Milian testified they searched for a home in which they could live together while Sanchez stated they wanted to find a house in which to live after marriage. Milian paid the $500 deposit required to reserve the vacant lot upon which the house was to be constructed and testified he made the loan application in his own name. Sanchez was on vacation at the time of the $500 payment, but she testified both parties provided financial statements to obtain the loan. Both parties' names appear signed to the offer and both parties signed escrow instructions. The eventual grant deed was taken in the names of both parties as joint tenants. Sanchez testified that to her "joint tenancy" meant the two would be partners in the property prior to marriage, while Milian testified he did not understand the significance of such designation and believed only that Sanchez would live with him and share expenses.

Only Milian occupied the house after its purchase. Although Sanchez fully participated in furnishing, decorating and landscaping the house and provided funds for these purposes, she refused to move in without marriage and never did occupy the house as a full-time resident. She had a key to the house and was there almost every weekend until the couple separated in late 1978.

Most of the couple's testimony concerned numerous exhibits which showed the extent to which they had commingled their property and collectively incurred expenses on the house and otherwise. Sanchez testified to providing $700 to Milian to help purchase a $7,000 bank money order for the down payment on the property; Milian apparently obtained most of the balance for the down payment from his father. Sanchez's cross-complaint for partition, however, alleges Milian's contribution to the down payment was only $4,950. The couple purchased more than $2,000 worth of furniture. Milian made the down payment; Sanchez later contributed $1,200. The monthly mortgage payments were paid by Milian out of his savings account. However, Sanchez testified that over eight months in 1978 she deposited to that savings account at least $4,300, including a $2,100 annual bonus from her employer and an $1,100 tax refund.

In addition, Sanchez testified she and Milian agreed she would make the monthly loan payments on Milian's Oldsmobile automobile in lieu of her responsibilities on the mortgage for the real property. Sanchez drove Milian's automobile for a considerable period because Milian had a longer commute to work and could get better mileage in Sanchez's Toyota; she testified that she signed ownership of her automobile over to Milian to get a decreased insurance rate because he was over 25 years of age. Milian testified to paying the majority of car insurance payments, while Sanchez stated they both paid for insurance but he wrote the checks. The purpose of all this was to have more money available to pay the mortgage payments and other expenses relating to the house and improvements.

Milian met the majority of property tax and insurance payments on the property for which Sanchez apparently only paid one month of property taxes and one 6-month premium payment for fire insurance.

In respect to other decoration and improvement, Sanchez paid $560 on drapes and incurred a $900 charge on her credit card for upgrading the quality of carpet for the house. The two shopped for linens and kitchen supplies together, evidently sharing these expenses. Sanchez also made considerable nonfinancial contribution to the decoration of the house, spending many weekends landscaping and weeding, shopping with Milian for various home improvements, and purchasing the large patio slab for behind

the house. Sanchez repeatedly testified her efforts in decorating the interior and exterior of the house were based on the shared assumption among the parties that the two eventually would marry and would live together in the house as husband and wife. Sanchez also frequently stated at trial that the couple's extensive financial entanglement was based upon an agreement that the two would be equal partners in owning the home, sharing all of their property and resources, and preparing for marriage.

The couple stopped dating in late 1978. Milian filed an action to quiet title in the subject property and for declaratory relief. Sanchez answered the complaint and filed her own cross-complaint seeking a declaration that she owned an undivided one-half interest in the property, a partition by sale granting her half the proceeds, compensation for Milian's use of the real and personal property in dispute, and a fair division of the personal property acquired by the parties during their relationship.

During trial, Milian attempted to prove, through the introduction of numerous exhibits showing his various expenses during the pendency of the relationship, that he was due compensatory credits representing his contributions to the aggregated pool of the couple's financial resources. In response, Sanchez introduced evidence to support the central assertion of her cross-complaint, i.e., that in anticipation of marriage the couple had agreed to pool their resources or some of them to acquire the property in dispute and had agreed to own it equally irrespective of their individual contributions to the purchase price and expenditures for improvements to and maintenance and preservation of the property.

The court's first statement of decision found the property was held in a true joint tenancy. After determining there was no wrongful ouster of Sanchez and that Milian was therefore not accountable for reasonable rental value, the court stated: "[P]laintiff is entitled to reimbursement to the extent of one-half of all sums expended by him in the reasonable maintenance and protection of the property. [Citation.] [¶] . . . Sums reasonably expended by plaintiff for the maintenance and protection of the property equal $20,431.68, entitling plaintiff to a credit of $10,215.84. Other expenditures made by plaintiff, and most of those made by defendant, were made in recognition of, and in furtherance of, their personal relationship with each other and not reasonably related to the improvement and upkeep or protection of the real property in question. [¶] . . . Likewise, defendant Sanchez is entitled to reimbursement for one-half of her expenditures made to maintain, improve or protect the property in the amount of $5,402.00, entitling her to a reimbursement credit in the amount of $2,701.00 from plaintiff."

Both parties filed objections to the original statement of intended decision and the court held a hearing at which the parties gave additional testimony

concerning their various expenditures in questioning by the court. In argument, Sanchez's attorney further urged that the agreement between the parties was to own and divide the property equally, making an accounting unnecessary.

The court thereafter rendered an interlocutory judgment of partition by sale of the real property in which it altered its original decision, ordering the proceeds of sale to be divided equally between the parties without any accounting, reimbursement or contribution. In its "Modified Notice of Intended Decision"[1] the court stated: "A careful review of the numerous exhibits consisting of checks, credit receipts, purchase receipts, tax bills, automobile repair invoices, together with the explanations regarding each of those expenditures demonstrates a relationship that far exceeds the normal arms length relationship entered into by persons who agree to jointly hold property . . . . [A] review of those exhibits and the testimony in explanation thereof illustrates a relationship that is far more intimate, complex and intertwined than casual dating. It appears that both ARTHUR and SYLVIA spent money jointly to accomplish all of the following purposes: purchase real property and build a house, furnish the interior of the home, improve the exterior of the home, landscape the property, purchase books for schooling for each other, cash transfers made each to the other, Christmas party, vacation expenses for each other's family members, payment on mortgage, taxes and insurance on the real property, each other's car payments, repair of each other's vehicles, credit purchases made to benefit each other and the real property, equipping the home with linen, pictures and other accoutrements. Credit obligations were incurred by the parties jointly which amounted in some instances to expenditures exceeding $1,800.00. The testimony of the parties discloses that, in some instances, payments on motor vehicles was [sic] made because the opposite party was making payments on the mortgage. [¶] In short, these parties treated both each other and the property in which they had a mutual interest in a fashion far different than the average real property owner or owners. There was, in fact, an implied contract by and between ARTHUR and SYLVIA to treat their property equally and to divide the same equally. Accordingly, it is the intent of the Court to divide the real property in question in conformity with the instructions of *Marvin* v. *Marvin,* 18 Cal.3d 660. [¶] Plaintiff, ARTHUR, is not entitled to credit for payments made on the house after separation in as much [sic] as the payments approximate the fair rental value of the premises. The other individualized expense items represented by the numerous exhibits are evidence of the existence of the implied contract mentioned herein and are not to be accounted for individually or separately in this order. The

---

[1]Apparently this was a misnomer. Most likely the document was intended to be a modified statement of decision.

property is ordered sold and the proceeds divided equally by and between the parties after payment of costs of sale.''

*Discussion*

1. *Application of the Marvin Decision*

■ Milian's initial contention is: ''The *Marvin* decision has no applicability to this case, in that the present case does not concern two cohabitating adults who were living in a meretricious relationship.'' Whether or not this contention is correct, it is of no consequence.

Milian is correct of course that *Marvin* was a case in which it was alleged that cohabitation and a meretricious relationship both existed. But the effect of *Marvin* was simply to place parties involved in such a situation in the same position as ''any other unmarried persons.'' (*Marvin,* 18 Cal.3d at p. 682.) The court explained that ''adults who voluntarily live together and engage in sexual relations are nonetheless as competent as any other persons to contract respecting their earnings and property rights.'' (*Id.* at p. 674.) Thus, if the absence of cohabitation and/or a meretricious relationship in the case at bench renders the *Marvin* decision less than fully applicable, it makes no difference because in that event the parties here are ''other unmarried persons'' ''competent . . . to contract respecting their earnings and property rights.'' (*Id.* at pp. 672, 674; accord *Trutalli* v. *Meraviglia* (1932) 215 Cal. 698, 701-702 [12 P.2d 430]; *Croslin* v. *Scott* (1957) 154 Cal.App.2d 767, 771-772 [316 P.2d 755]; *Bridges* v. *Bridges* (1954) 125 Cal.App.2d 359, 363 [270 P.2d 69].)

It is of course true that cohabitation and the rendition of housekeeping and similar services may be an important factor in the determination as to whether or not an implied agreement or ''tacit understanding'' (*Marvin,* 18 Cal.3d at p. 684) exists. ■ However, the only limitation upon the right of unmarried persons to contract with respect to their property and financial arrangements is that the contract must not be illegal or against public policy. As stated repeatedly by the court in *Marvin:* ''Agreements between nonmarital partners fail only to the extent that they rest upon a consideration of meretricious sexual services'' (*Id.* at pp. 670-671); ''a contract between nonmarital partners is unenforceable only *to the extent* that it *explicitly* rests upon the immoral and illicit consideration of meretricious sexual services'' (*Id.* at p. 669, italics in orig.). ■ In any event, each case will turn on its own facts, and cohabitation is not a prerequisite to the finding of an implied agreement between unmarried persons concerning their property.

 Milian apparently recognizes this, because his next complaint is that the court failed to treat him and Sanchez as any other unmarried persons. The argument is that the evidence establishes, and indeed that the trial court found in its original statement of decision, that the parties were joint tenants and the court failed to treat the parties as other joint tenants when it refused to provide for an accounting and reimbursement or contribution even though the parties' contributions to the purchase price of the property and their subsequent expenditures for improvement, maintenance and preservation of the property were unequal. This contention, however, fails to take account of the implied agreement between the parties found by the trial court.

 It is of course correct that a cotenant who pays taxes, trust deed payments or other charges against the property or expends money for the preservation of the property or who, with the assent of his cotenant, makes improvements to the property is entitled to contribution from the cotenant, and on partition by sale is entitled to reimbursement for those expenditures before division of the proceeds among the property owners. (See, e.g., *Willmon* v. *Koyer* (1914) 168 Cal. 369, 374 [143 P. 694]; *Southern Adjustment Bureau* v. *Nelson* (1964) 230 Cal.App.2d 539, 541 [41 Cal.Rptr. 148]; *Shenson* v. *Shenson* (1954) 124 Cal.App.2d 747, 754-755 [269 P.2d 170]; *Combs* v. *Ritter* (1950) 100 Cal.App.2d 315, 320 [223 P.2d 505]; 3 Witkin, Summary of Cal. Law (8th ed. 1973) Real Property, §§ 214-216, pp. 1947-1948.) However, what Milian fails to deal with is that the court ultimately declined to make an accounting and order reimbursement in this case because it found an agreement between the parties to own and divide the property equally irrespective of the exact dollar contributions of each party to the purchase price or to the subsequent improvement, maintenance, or preservation of the property. The parties were perfectly competent to make such an agreement and the critical question on appeal is whether the court's finding of such an agreement is supported by substantial evidence.

Milian accentuates the finding of the court in its original statement of decision that in purchasing the property the parties intended and created a true joint tenancy, as if the court's subsequent determination the property should be divided equally is inconsistent with the original finding of joint tenancy. It is true of course that in the original statement of decision the court had indicated that both parties were entitled to reimbursement for some of their expenditures, resulting in a net credit to Milian, and the court's ultimate determination that no accounting or contribution was required was certainly at odds with that. However, given the agreement found by the court, its original finding of joint tenancy is not inconsistent with its later determination that no accounting or contribution was required. Indeed, even absent the agreement found by the court, insofar as any disparity in the

contributions of the parties to the initial acquisition of the property is concerned, the determination there was a true joint tenancy supports the court's determination that there need be no accounting or contribution.

Milian cites two cases for the proposition that upon partition a cotenant who has paid a disproportionate portion of the purchase price is entitled to reimbursement of the portion disproportionately paid: *Demetris* v. *Demetris* (1954) 125 Cal.App.2d 440 [270 P.2d 891] and *Donnelly* v. *Wetzel* (1918) 37 Cal.App. 741 [174 P. 689]. However, neither case holds or indicates that rule is applicable in a case involving true joint tenants. Nor indeed have we discovered a single case in which a true joint tenancy was found and yet an accounting and contribution was ordered because of disproportionate contributions by the parties to the original purchase price. In *Demetris* a joint tenancy deed was involved, but the action was for reformation of the joint tenancy deed and partition, and the court "ordered the deed reformed so as to become a tenancy in common deed" (*Demetris, supra,* 125 Cal.App.2d at pp. 442-443) before it ordered various reimbursements. So the *Demetris* case in the final analysis is a case dealing with the rights of tenants in common, not joint tenants.

*Donnelly* v. *Wetzel, supra,* 37 Cal.App. 741, 742, involved tenants in common from the outset.

■ Though the discovery gives us some discomfort in terms of legal symmetry, it appears to us that once the court in a partition action has determined that a true joint tenancy exists, it may not order reimbursement or contribution on account of differences in the amounts the parties have paid toward the initial acquisition of the property.[2] ■ Of course, if one joint tenant has advanced funds on behalf of the other and there is an agreement between them for reimbursement in the event of sale of the property, that agreement can be enforced by the court. (*Donnelly* v. *Wetzel, supra,* 37 Cal.App. 741.) However, by definition joint tenancy ownership means equal ownership (see Civ. Code, § 683[3]), and in the absence of an agreement for reimbursement we are unaware of any authority which authorizes reimbursement on account of unequal contributions to the down payment.

■ Of course, the significance of the disparate treatment of joint tenants and tenants in common is more theoretical than real because in a suit for

---

[2]Our discomfiture is increased by our observation that upon dissolution of a partnership or joint venture an accounting for and reimbursement of capital contributions would occur in the absence of an agreement otherwise. (See Corp. Code, § 15040.)

[3]Civil Code section 683 reads in pertinent part: "A joint interest is one owned by two or more persons *in equal shares,* by a title created by a single will or transfer . . . ." (Italics added.)

partition all parties' interests in the property may be put in issue regardless of the record title (Code Civ. Proc., § 872.610; *Kershman* v. *Kershman* (1961) 192 Cal.App.2d 23, 26 [13 Cal.Rptr. 290]; *Demetris* v. *Demetris, supra,* 125 Cal.App.2d 440, 444-445; *Cosler* v. *Norwood* (1950) 97 Cal.App.2d 665, 666 [218 P.2d 800]), and the court may consider the fact the parties have contributed different amounts to the purchase price in determining whether a true joint tenancy was intended (*Kershman* v. *Kershman, supra; Cosler* v. *Norwood, supra*). If a tenancy in common rather than a joint tenancy is found, the court may either order reimbursement (see *Demetris* v. *Demetris, supra,* 125 Cal.App.2d 440, 445) or determine the ownership interests in the property in proportion to the amounts contributed (see *Kershman* v. *Kershman, supra,* 192 Cal.App.2d 23, 26-27). It appears to be otherwise in respect to true joint tenancies, however, where by definition ownership of the property is equal.

 The burden of all this is twofold: first, there is no inconsistency in the court's finding of joint tenancy and its ordering equal division of the property. Secondly, when the contributions to the down payment on the property are disregarded, the disparity in the potentially reimbursable contributions of these parties is not nearly so great as Milian contends. As observed in the statement of facts, although Milian paid all of the mortgage payments out of a savings account in his name, Sanchez contributed substantial sums of money for deposit to that account.

 In respect to the claimed inconsistency, Milian also points out that the interlocutory judgment declares that Milian and Sanchez own the property equally as tenants in common. However, again we discern no inconsistency. An interlocutory judgment of partition has the effect of severing a joint tenancy so that thereafter the owners are tenants in common. (See *Hammond* v. *McArthur* (1947) 30 Cal.2d 512, 515 [183 P.2d 1]; *Teutenberg* v. *Schiller* (1955) 138 Cal.App.2d 18, 22 [291 P.2d 53].) The judgment quite properly declared the parties had become tenants in common.

 We come then to the question whether the court's finding that the parties agreed to own and divide the property equally irrespective of the exact dollar amounts each contributed to the acquisition, improvement, maintenance and preservation of the property is supported by substantial evidence. We conclude it is.

While Milian points to a number of inconsistencies in the positions taken by Sanchez from time to time and in her testimony, these created at most conflicts in the evidence, and Sanchez's testimony at trial taken together with the actions of both parties fully supports the trial court's finding of an implied agreement to own and divide the property equally, irrespective of

the amount contributed by each to its acquisition, improvement, maintenance and preservation. Sanchez testified the reason she transferred title to her automobile to Milian was that he was over 25 years old and could obtain a cheaper rate on automobile insurance thereby making more money available for the mortgage payments and other expenditures relating to the house. Indeed, the entire arrangement by which Milian drove Sanchez's more economical automobile, perhaps as much as 70,000 miles, and by which Sanchez drove Milian's vehicle and paid for its insurance and repairs, was to make more money available for expenditures relating to the house. In fact, Sanchez testified the parties agreed that this arrangement would be in lieu of her contributing toward the mortgage payments otherwise.

The trial court obviously did not credit Milian's testimony as to how the property came to be taken in the names of both parties as joint tenants nor his testimony that he did not understand what a joint tenancy meant. The arrangement between the parties viewed in its entirety, including Sanchez's turning over to Milian substantial sums of money including her $2,100 bonus and her $1,100 tax refund in 1978, and also including Milian's occupancy of the property and payment of the monthly mortgage payments, insurance and taxes, gives rise to a strong inference that each party agreed to contribute what they could and that irrespective of the inequality of their contributions the property would be owned equally.

Quite revealing was the response of Sanchez to questions by the court in the proceedings following issuance of the court's original statement of decision. The court asked whether there was some agreement that Sanchez would contribute toward the house payment. She replied: "We had agreed before the house was purchased." The court then asked: "Was there some agreement as to how much each of you would pay?" Sanchez answered: "No." The court then asked Sanchez with respect to a number of the exhibits before it: "How did you select the amounts to be paid on these checks?" Sanchez answered: "At the time I was paying for his car, the car payment and some other bills that were of his. Whenever I had x number of dollars to spare I would, you know, put it . . . in the savings account." The irresistible inference is that each party was to contribute whatever they could toward acquisition, improvement, maintenance and preservation of the property.

Milian makes a great deal of his testimony that after Sanchez discovered he was seeing another woman she demanded the return of "her property" or "the property she had bought" together with the money she had contributed. However, Sanchez's version was somewhat different. She testified she demanded only certain items of furniture for her own use together with her share of the equity. She testified she did not consider the few items of

furniture she removed from the house as anywhere near an equal division of the furniture. ▆▆ As an appellate court we are required to accept the version most favorable to the judgment. ▆▆ However, it makes little difference, because whatever it was that Sanchez demanded, it does not necessarily follow that she was demanding everything she was legally entitled to. In other words, what Milian refers to is just one more conflict in the evidence, which on appeal can avail him nothing.

In conclusion, the record shows the parties anticipated marriage and took title to the property as equal owners in joint tenancy. They both contributed significant financial resources and nonfinancial efforts to the acquisition of the home, furnishings, appliances, improvements, decoration and landscaping. Quite clearly, they intended to own the property equally and there is substantial evidence that each was to contribute what he or she could and that both intended the property to be owned equally irrespective of inequality in the amounts contributed by each.

Milian's remaining contentions require only brief discussion. They are devoid of merit. First, he asserts: "The trial court's finding of an implied *contract* between the parties to treat and divide all their property equally leads to the absurd conclusion that Appellant was contractually *bound* to share his entire income and assets with Respondent at all relevant times . . . ." (Italics in orig.) Not so. The contract found by the court was one concerned only with the acquisition, improvement and maintenance of the particular house in question and the furniture and furnishings purchased for use in that house. It did not relate to or encompass all the property of the parties nor the income of either. Thus, there is no inconsistency whatever in the fact that the parties maintained separate checking and savings accounts in their individual names and that neither had direct access to the accounts of the other.

Next, although Milian first chides the trial court for its statement it intended to divide the property "in conformity with the instructions of *Marvin* v. *Marvin*" because, as he points out, the *Marvin* decision in no way gave any instructions with respect to division of property, Milian also complains that the trial court failed to comply with *Marvin*'s mandate that property acquired by nonmarital partners be divided "fairly." Not only is Milian's position inconsistent, it is also incorrect. The trial court ordered division of the property in accordance with the implied agreement between the parties. Apparently it perceived no unfairness in that. Neither do we.

Milian next contends the result reached amounts to a forfeiture. We do not agree. In the first place, as already observed, we do not view the disparity in economic contributions nearly as great as does Milian. But in any event,

the division of the property ordered by the trial court is a result of the implied agreement between the parties. ■ Where the consideration for an agreement is adequate, courts do not normally inquire into the equality of the bargain. ■ How would a court determine which party got the better of the bargain here where not only money but also services and the intermingling and use of other property was involved and Milian alone had actual use of the property from the time of its purchase to the present time?

■ Milian also takes issue with the court's failure to ascertain the reasonable rental value of the property and balance that against his expenditures for mortgage payments, insurance, taxes and maintenance after the "separation" of the parties.[4] No such determinations were required. Separation is significant in marital cases because normally before separation the earnings of the parties constitute community property (Civ. Code, § 5110) and after separation the earnings of each party constitute their separate property (Civ. Code, § 5118). Here, the earnings of the parties were never community property and the parties' "separation" was irrelevant except to the issue of ouster as to which Milian prevailed. The division of the property is governed by the implied agreement found by the court, and that agreement did not terminate upon "separation" of the parties.

■ Finally, Milian contends the result reached by the court places Sanchez in a better position than she would be in if the parties had been married. There are two equally dispositive answers. The first is, so what? If the division of the property is in accordance with the agreement of the parties, the fact that some other division might have resulted from some other relationship or agreement is immaterial. The second is that this contention is based largely if not exclusively on the assumption that Civil Code section 4800.2, providing for reimbursement of separate property contributions to community property, would be applicable here if these parties were married. That assumption, however, is incorrect. ■ Civil Code section 4800.2 may not be constitutionally applied to transactions which resulted in the creation of vested rights prior to its effective date. (*In re Marriage of Fabian* (1986) 41 Cal.3d 440 [224 Cal.Rptr. 333, 715 P.2d 253]; *In re Marriage of Lachenmyer* (1985) 174 Cal.App.3d 558, 563-564 [220 Cal.Rptr. 76]; *In re Marriage of Kahan* (1985) 174 Cal.App.3d 63, 69-70 [219 Cal.Rptr. 700].)[5]

We have no occasion to discuss any question relating to the division of the furniture and furnishings acquired by the parties because the interlocutory

---

[4]Milian does with considerable justification criticize the court's use of the word "separation" in its modified notice of intended decision.

[5]We are aware of the recent legislation providing in essence that the 1983 amendment to Civil Code section 4800.2 is to be applied to all cases filed after January 1, 1984 (Stats. 1986, ch. 49, § 1, p. —) but we are not required to consider it on this appeal because this case was filed on January 15, 1979.

judgment of partition does not purport to adjudicate the parties' rights with respect thereto.

## Disposition

The interlocutory judgment of partition is affirmed.

Rickles, Acting P. J., and McDaniel, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 20, 1986.