Filed 2/10/15  Charlton v. Russo CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| PATRICIA CHARLTON, | H039249 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. CV169634) |
| v. | |
| RAYMOND RUSSO, | |
| Defendant and Appellant. | |

Defendant Raymond Russo appeals from a judgment in favor of plaintiff Patricia Charlton in her implied contract and fraud action against him.  He challenges the sufficiency of the evidence to support the jury's implied contract verdict and claims that the trial court gave prejudicially misleading jury instructions on the implied contract cause of action.  We affirm the judgment.

## I. Evidence Presented At Trial

Charlton was living in an apartment in San Jose when she began dating Russo in 1987.  Russo was living in a house on Curtner Avenue in San Jose.  Russo began frequently spending the night at Charlton's apartment, usually spending the weekend with her.  Russo, who worked for a pharmaceutical company, travelled often on business, and Charlton accompanied him on many trips at his request to "support him."  When Charlton

accompanied Russo on business trips, she entertained Russo's clients' wives at his request as part of the "trade relations" that were necessary for his job. At Russo's business events, Charlton was sometimes identified as Russo's spouse.[1] She and Russo frequently discussed his business, and she would "help him" with it. At some point, Russo proposed marriage and gave Charlton a ring.

In 1991, Russo's work required him to move to New Jersey. At Russo's request, Charlton moved into Russo's Curtner Avenue home "and took care of it while he was gone." She and Russo continued their relationship during the 10 months that he lived in New Jersey and maintained daily telephone contact. She visited him in New Jersey for a week or two at a time, and once a month he spent the weekend with her at the Curtner Avenue home. When they were together in New Jersey, Charlton cooked for Russo and did the washing. She even cooked meals and froze them so he would have meals after she went back to San Jose.

In 1992, Russo moved back to the Curtner Avenue home, and he and Charlton lived there together until 1996. They sometimes shared a bedroom but mostly did not. Charlton used the master bedroom; Russo slept on the couch. In 1995, Charlton began looking for a separate home for herself. Although she and Russo were committed to their relationship, Charlton wanted her "own space." She located a home on Koch Lane in San Jose, which was less than a mile away from Russo's home on Curtner. The Koch Lane house, which was built in 1957, was in "bad shape," but Charlton intended to "fix it." Charlton was expecting an inheritance but had not yet received it. Russo offered to fund the down payment of $30,000 and "get the loan" for the Koch Lane property, and he did so. He also paid for a new roof and termite repairs for the Koch Lane home.[2] At Russo's

---

[1]     Charlton never represented to anyone that she was Russo's spouse.

[2]     The down payment was apparently $30,170. Russo spent $3,000 for termite work and $11,320 for the roof.

request, Charlton spent $7,000 to pay off Russo's Cadillac so that Russo could qualify for the loan on the Koch Lane home.

Charlton moved into the Koch Lane home in 1996. Russo continued to live at the Curtner Avenue home because he "liked to have his own space." Charlton and Russo shared a dog, and the dog lived at the Koch Lane home. Their understanding was that Charlton would acquire ownership of the Koch Lane home by "pay[ing] [Russo] back" for his contribution to its acquisition. Charlton expected Russo to transfer title to her when she received her inheritance and took over the mortgage. Russo did not expect her to reimburse him for the mortgage payments he had made. Russo understood that Charlton considered the Koch Lane home to be her home, and he told Charlton that "[i]t was [her] house."

Charlton made extensive improvements to the Koch Lane home, all at her own expense, and she paid for all maintenance expenses for the home. She hired contractors and spent between $120,000 and $150,000 on these improvements. She removed the wallpaper, had the interior painted, installed new carpeting and baseboards, added a brick hearth to the fireplace, added and replaced electrical outlets, sockets, and switches, installed new window shutters, and replaced cabinets, appliances, doors, and flooring. She remodeled the bathrooms, replacing the fixtures, flooring, tile, sheetrock, and sink, and installing a new Jacuzzi tub. Charlton put in new fences, a new heater and an air conditioning system, new screen doors, new locks, and an alarm system. She had a new sprinkler system and landscaping installed, put in a new concrete patio, and had the house's exterior painted. After these improvements, the Koch Lane home was "absolutely a different house." Russo knew that Charlton was undertaking these improvements at her own expense and agreed with her that they should be undertaken. Russo did not intend to reimburse Charlton for these expenses.

Russo repeatedly assured Charlton that he would put her name on the deed to the Koch Lane home, but he never did. In 1997, Russo told Charlton that the Koch Lane

3

home would be hers if she repaid him for the down payment, termite work, and roof costs (a total of $44,490) and took over the mortgage (which at that point had a balance of $233,814).[3] However, when Charlton offered to take over the mortgage payments, Russo refused.

In 1998, Russo gave Charlton a document entitled "Declaration of Well [*sic*]." The document stated: "[I]n the event of my death, Patricia M. Charlton has first right to the property located at 1135 Koch Lane, San Jose, CA 95125. Patricia M. Charlton will also be responsible for any financial obligations in the event of my death to the above named property. [¶] Patricia has invested a large sum of money which has gone to the improvement and has added value to the property at 1135 Koch Lane, San Jose, California, 95125, and I wish to protect her vested interests." Russo told Charlton that this document would ensure that she would own the Koch Lane property.

Charlton lived in the Koch Lane home from 1997 to 2010. Russo stayed with her there for a week or more on a couple of occasions and visited her there frequently.[4] When he was in San Jose, he spent the majority of his time at the Koch Lane home. Charlton cooked for him and took responsibility for his special diet. She spent on average an hour a day performing housekeeping, shopping, food preparation and other services for Russo and the Koch Lane home. Charlton also spent a lot of time supervising the improvements to the home. Charlton did not have a job outside the home after 2000. She believed that her contributions of her time were part of her "contribution" to her agreement with Russo regarding her future ownership of the Koch Lane home. Charlton thought that their bargain was that the Koch Lane home "is mine."

---

[3] Russo confirmed this at trial. He testified: "She would have to take over the mortgage and the 44,000 plus and the house would be hers."

[4] Charlton testified that Russo had lived with her at the Koch Lane home in 2008 and that they had "cohabited" for 14 years. However, she clarified that he did not move into the home and did not bring his clothes and belongings into the home.

4

Charlton continued to make improvements to the property over the years. Russo continued to pay the mortgage, insurance, and taxes on the property. Charlton paid for the garbage, water, PG&E, phone, cable, gardener, and all other household expenses.

Russo retired in 2001, but he started a new business that occupied a great deal of his time. In 2008, Russo began to visit Charlton and the Koch Lane home less frequently. In 2009, there was a period of four months when Russo made no effort to contact Charlton and did not respond to her attempts to contact him. At the end of this four-month period, in July 2009, Russo sent Charlton a certified letter giving her "30-day notice" that he was "raising the rent to $2,500 per month as of September, 2009, for the house located at 1135 Koch Lane." Russo had never before asked Charlton to pay rent, and she had never paid any rent although she had repeatedly offered to take over the mortgage if Russo would put her name on the deed.

In September 2009, Russo sent Charlton a three-day notice to pay rent or quit and an eviction notice. Charlton tried to talk to Russo about the matter, but he just told her "I want you out." When Charlton's son asked Russo about Charlton's investment in the improvements to the Koch Lane home, Russo said " 'But nothing's in writing.' " Russo filed an unlawful detainer action and had Charlton evicted from the Koch Lane home in 2010. Russo immediately put the Koch Lane home up for sale at a price of $799,900.

## II.  Procedural Background

In 2010, Charlton brought an action against Russo for breach of implied contract, quantum meruit, breach of oral contract, specific performance, fraud, negligent infliction of emotional distress, and declaratory relief. Russo's summary adjudication motion was granted as to Charlton's causes of action for breach of oral contract and specific performance. Russo filed a cross-complaint alleging several causes of action against Charlton.

5

The jury rejected Russo's causes of action against Charlton and returned verdicts in favor of Charlton on her implied contract and fraud causes of action. The jury awarded Charlton $656,510 in damages for Russo's breach of an implied contract. On the fraud cause of action, the jury identified Charlton's damages as "title to the Koch Lane property upon reimbursement to Russo of the down payment, fumigation and roof repair costs and assumption of the mortgage payments."[5]

The court entered judgment on the jury's verdicts awarding Charlton $656,510 "which shall become a judgment lien" on the Koch Lane property. Russo was ordered to hold the Koch Lane property in a constructive trust for Charlton "until the Property is either transferred to Charlton or the judgment lien is satisfied in full." Russo timely filed a notice of appeal from the judgment.

### III. Discussion

### A. Substantial Evidence

Russo contends that there was insufficient evidence of an implied contract because he and Charlton did not cohabitate, take joint title to the home, hold themselves out as husband and wife, or pool their financial resources. He claims that Charlton "relies on unlawful consideration" and that there was no evidence that "a contract existed."

"'Contracts may be express or implied. These terms however do not denote different kinds of contracts, but have reference to the evidence by which the agreement between the parties is shown. If the agreement is shown by the direct words of the parties, spoken or written, the contract is said to be an express one. But if such

---

[5] The jury also found that Russo had been negligent, but that Charlton had not suffered serious emotional distress. On Charlton's quantum meruit cause of action, the jury found that she had provided services, but it awarded no additional damages because "[i]ts [*sic*] our intention to give Pat Charlton the house or 656,510$ not both." These verdicts are not at issue on appeal.

6

agreement can only be shown by the acts and conduct of the parties, interpreted in the light of the subject matter and of the surrounding circumstances, then the contract is an implied one.'" (*Marvin v. Marvin* (1976) 18 Cal.3d 660, 686, fn. 16 (*Marvin*); accord *Maglica v. Maglica* (1998) 66 Cal.App.4th 442, 455 (*Maglica*).)

"[T]he elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821.) A contract exists where the parties had the capacity to contract, mutually consented to an agreement with a lawful object, and consideration was exchanged. (Civ. Code, § 1550.) "In the formation of contracts, consideration is the exchange for a promise." (*Simmons v. California Institute of Technology* (1949) 34 Cal.2d 264, 279.) "Agreement may be '"shown by the acts and conduct of the parties, interpreted in the light of the subject matter and of the surrounding circumstances."'" (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 681.)

Russo appears to be challenging the sufficiency of the evidence that he consented to the agreement and the sufficiency of the evidence that consideration was exchanged. "'When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact.'" (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.) "'[W]e have no power to judge of the effect or value of the evidence, to weigh the evidence, to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom.'" (*Leff v. Gunter* (1983) 33 Cal.3d 508, 518.) Our role is limited to determining whether the evidence before the trier of fact supports its findings. (*Reddy v. Gonzalez* (1992) 8 Cal.App.4th 118, 123.)

Russo's contentions lack merit. Russo himself testified at trial that he and Charlton had an understanding that "[s]he would have to take over the mortgage and [pay him] the 44,000 plus and the house would be hers." Charlton's testimony confirmed the nature of their agreement. Russo had told her that the Koch Lane home would be hers if she repaid him for the down payment, termite work, and roof costs (a total of $44,490) and took over the mortgage. Uncontested evidence demonstrated that Charlton had invested money, effort, and time in renovating and maintaining the Koch Lane home. This evidence amply supports the jury's finding that there was mutual consent to the agreement.

The evidence of consideration exchanged was equally powerful. Charlton invested between $120,000 and $150,000 of her own funds plus substantial time and effort in undertaking extensive renovations to the Koch Lane home in exchange for Russo's promise that she would be able to obtain ownership of the home. Her money, time, and effort was fully adequate and lawful consideration to support the agreement. Of course there was also substantial evidence of the other elements of a breach of contract cause of action. Charlton continued to make renovations to the Koch Lane home and maintain it for 14 years, thereby performing her end of the bargain. Russo breached their agreement by refusing to permit her to obtain title to the property pursuant to their agreement and evicting her from the home.

Russo puts misplaced reliance on *Alderson v. Alderson* (1986) 180 Cal.App.3d 450 (*Alderson*). *Alderson*, like *Marvin*, arose from a long-term nonmarital relationship. (*Alderson*, at p. 456.) The Aldersons acted as if they were married, had children together, purchased properties together, maintained joint bank accounts, and filed joint tax returns. (*Ibid.*) When their relationship ended, Steve Alderson forced Jonne Alderson to sign over all of the properties to him. (*Id.* at p. 457.) She brought an implied contract action against him seeking an equal division of the properties and prevailed in the trial court. (*Id.* at pp. 457-458.) On appeal, Steve Alderson claimed that the contract was "illegal"

8

because it was based on "'sexual services.'" (*Id.* at p. 459.) The Court of Appeal rejected his claim. "As the *Marvin* court pointed out, the fact that a man and woman live together without marriage, and engage in a sexual relationship, does not in itself invalidate agreements between them relating to their earnings, property or expenses." (*Id.* at p. 463.) "A contract based on 'many . . . things,' no one of which is in itself crucial, is not the same as one based upon a consideration of meretricious sexual services. [¶] Before a nonmarital contract is to be deemed unenforceable under *Marvin*, it must be found to explicitly rest upon a consideration of meretricious sexual services and even then the contract will fail 'only to the extent' that it does so." (*Ibid.*)

*Alderson* provides no support for Russo's challenge to the jury's implied contract verdict. The evidence presented at trial by both Russo and Charlton established that their agreement regarding the Koch Lane home was based on their mutual financial contributions and Charlton's contribution of her time and effort. There was no evidence whatsoever that "meretricious sexual services" played any role in their agreement. Indeed, there was no evidence presented at trial that Russo and Charlton, who rarely even shared a bedroom, had a sexual relationship.

In *Marvin*, the California Supreme Court held that "a nonmarital partner" should be permitted "to assert rights based upon accepted principles of implied contract or equity." (*Marvin*, *supra*, 18 Cal.3d at p. 682.) "The parties [to a nonmarital relationship] may well expect that property will be divided in accord with the parties' own tacit understanding and that in the absence of such understanding the courts will fairly apportion property accumulated through mutual effort. We need not treat nonmarital partners as putatively married persons in order to apply principles of implied contract, or extend equitable remedies; *we need to treat them only as we do any other unmarried persons*." (*Marvin*, at p. 682, italics added.) Charlton and Russo had the right to contract with one another, and their nonmarital relationship did not interfere with their right to do so.

9

Russo suggests that Charlton could not prevail on her implied contract cause of action because she and Russo did not cohabit. "It is of course true that cohabitation and the rendition of housekeeping and similar services *may be* an important factor in the determination as to whether or not an implied agreement or 'tacit understanding' (*Marvin*, 18 Cal.3d at p. 684) exists. *However, the only limitation upon the right of unmarried persons to contract with respect to their property and financial arrangements is that the contract must not be illegal or against public policy.* As stated repeatedly by the court in *Marvin*: "Agreements between nonmarital partners fail only to the extent that they rest upon a consideration of meretricious sexual services" (*Id.* at pp. 670-671); 'a contract between nonmarital partners is unenforceable only *to the extent* that it *explicitly* rests upon the immoral and illicit consideration of meretricious sexual services' (*Id.* at p. 669, italics in orig.). In any event, each case will turn on its own facts, and cohabitation is not a prerequisite to the finding of an implied agreement between unmarried persons concerning their property." (*Milian v. De Leon* (1986) 181 Cal.App.3d 1185, 1193, italics added.)

*Bergen v. Wood* (1993) 14 Cal.App.4th 854 (*Bergen*) did not hold otherwise. In *Bergen*, the court opined: "Cohabitation is necessary not in and of itself, but rather, because from cohabitation flows the rendition of domestic services, which services amount to lawful consideration for a contract between the parties. [¶] We make the additional observation that if cohabitation were not a prerequisite to recovery, every dating relationship would have the potential for giving rise to such claims, a result no one favors." (*Bergen*, at p. 858.) Taken out of context, these observations might suggest that cohabitation is necessary, which would conflict with *Milian*.[6] In context, however, there

---

[6] The *Bergen* court distinguished *Milian* on the ground that *Milian* did not concern future support, which was the subject of the action in *Bergen*, but rights to a jointly purchased property. (*Bergen*, *supra*, 14 Cal.App.4th at p. 858.)

10

is no conflict.  The *Bergen* court made these observations in a case where the plaintiff sought future support based solely on a sexual and social relationship between the parties.  "Because services as a social companion and hostess are not normally compensated and are inextricably intertwined with the sexual relationship (see *Whorton, supra,* 202 Cal.App.3d at p. 454), Bergen failed to show any consideration independent of the sexual aspect of the relationship.  Therefore, the agreement was unenforceable for lack of consideration." (*Bergen*, *supra*, at pp. 859-860.)

Where the evidence demonstrates that there was lawful consideration outside of the sexual and social aspects of a dating relationship, cohabitation need not be shown.[7] This case turns on its own facts, and cohabitation played no role here.[8]  Russo invested $44,490 in the initial acquisition of the Koch Lane home and paid the mortgage payments, taxes, and insurance during their relationship.  Charlton invested $120,000 to $150,000 of her own funds in extensive renovations to the Koch Lane home, personally supervised those renovations, expended considerable personal efforts toward the improvement of the home, and paid 14 years of maintenance expenses for the home.  She also paid $7,000 to pay off Russo's Cadillac so that he could obtain the mortgage for the Koch Lane home.  Throughout their relationship, Russo spent much of his time at the

---

[7]     Even homemaking services alone may provide lawful consideration for an implied contract.  "No case, however, suggests that a pooling agreement in which one partner contributes only homemaking services in invalid . . . .  A promise to perform homemaking services is, of course, a lawful and adequate consideration for a contract [citation]--otherwise those engaged in domestic employment could not sue for their wages . . . ." (*Marvin*, *supra*, 18 Cal.3d at p. 670, fn. 5.)

[8]     Russo argues that public policy precludes Charlton from prevailing in this action because that "would open the floodgates to litigation of dating couples seeking to benefit from their dating relationship as would a marital couple."  Not so.  Like any other civil litigant, Charlton was required to establish all of the elements of her implied contract cause of action, including lawful consideration.  Her success in her action did not even challenge, let alone extend, the boundaries of well-established precedents governing implied contract actions.

Koch Lane home and enjoyed the fruits of both his investment and Charlton's investments in the home. Their mutual understanding from the beginning was that Charlton would acquire ownership of the Koch Lane home upon repaying Russo's original $44,490 investment and taking over responsibility for the mortgage. Charlton's substantial financial investment in the Koch Lane home was fully adequate and legal consideration for this agreement.

We reject Russo's challenges because the record contains substantial evidence of the existence of a contract, lawful consideration, and the requisite elements of a breach of implied contract cause of action.

### B. Alleged Instructional Error

Russo contends on appeal that the trial court prejudicially erred in giving the jury a misleading instruction "regarding cohabitation." His contention is fatally flawed because the appellate record that he has provided does not contain the court's instructions to the jury.

"'A judgment or order of the lower court is *presumed correct*. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.'" (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) "It is well settled, of course, that a party challenging a judgment has the burden of showing reversible error by an adequate record." (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 574.) "It is appellant's burden to demonstrate error by an adequate record [citation], and without an adequate record we must assume facts in support of the trial court's order." (*Vermeulen v. Superior Court* (1988) 204 Cal.App.3d 1192, 1198-1199.)

Russo has failed to meet his burden. Neither the clerk's transcript nor the reporter's transcript includes the text of the jury instructions that were read to the jury by the trial court. This is the natural consequence of the fact that Russo did not include the jury instructions in his February 2013 notice designating the record on appeal. The

12

record on appeal was filed on June 11, 2013. On July 16, Russo obtained an extension of time to file his opening brief. On July 25, Russo filed a motion to augment the record with the reporter's transcript of the jury instructions, but he did not attach the transcript. Charlton opposed the motion on the ground that she would be prejudiced by the delay since she was not able to enforce the judgment while the appeal was pending. On August 15, Russo obtained a second extension of time to file his opening brief. On August 19, Russo filed a second motion to augment seeking to augment with both the reporter's transcript of the jury instructions, which again was not attached, and an attached document that purported be a printed copy of the jury instructions that the court had read to the jury.

On August 27, 2013 and September 18, 2013, this court filed orders denying both of Russo's motions without prejudice to him refiling a motion to augment with the reporter's transcript attached and accompanied by a declaration addressing the delay. On September 20, Russo filed his opening brief, which included just two contentions: his challenge to the sufficiency of the evidence and his instructional error claim. On November 21, Charlton filed her respondent's brief. In her brief, she argued that Russo could not challenge the judgment based on instructional error because he had failed to include the jury instructions in the appellate record.

On December 10, 2013, Russo filed another motion to augment, again without a copy of the reporter's transcript and again accompanied by the same document that had been attached to the August motion. The only explanation offered in the declaration attached to the December motion for the absence of the jury instructions in the appellate record was that it was due to "inadvertent clerical error." On December 11, Russo filed his reply brief. Charlton filed opposition to the December motion on the ground that the belated request for augmentation would prejudice her due to the fact that she had already filed her brief. In January 2014, this court denied the December 2013 motion.

As this chronology demonstrates, Russo failed to make a good faith effort to expeditiously provide an appellate record that included the jury instructions. He did not include the jury instructions in his original designation of the record. Despite the denial of his motions to augment, he filed an opening brief that challenged the judgment on the basis of instructional error. Had he obtained the reporter's transcript that was the subject of his July and August motions in response to this court's suggestion in its August 2013 order and refiled his motion before he filed his opening brief, the transcript could have been available to Charlton when her counsel was preparing the respondent's brief. By failing to do so, he deprived Charlton of a fair and timely opportunity to address this issue on an adequate appellate record. Due to the absence of the jury instructions from the appellate record, we must presume that the trial court properly instructed the jury and reject Russo's claim of instructional error.

Russo claims that, even without a record of the jury instructions given by the trial court, the record he has provided is adequate because it includes a reporter's transcript of the instruction conference during which the parties and the court discussed some of the jury instructions. We disagree. At the instruction conference, there was some discussion of a "special" jury instruction that concerned "cohabitation," but this discussion, which concerned the precise wording of a proposed jury instruction that is not in the record, does not provide an adequate record to permit review of Russo's claim of instructional error.[9]

"It is well established in California that the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." (*People v. Burgener* (1986) 41 Cal.3d 505,

---

[9]  At the end of the discussion, the court said: "Well, I'm going to go ahead and give the cohabitation instruction as written." Although it was clear that the court was referring to a jury instruction on cohabitation proposed by Charlton, the proposed jury instruction itself is not in the record.

538, disapproved on a different point in *People v. Reyes* (1998) 19 Cal.4th 743, 756.) "[An] instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." (*Estelle v. McGuire* (1991) 502 U.S. 62, 72.) "Whether a jury has been misled by an erroneous instruction or by the overall charge must be determined by an examination of all the circumstances of the case including a review of all of the evidence as well as the instructions as a whole." (*Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 59.) The limited discussion at the instruction conference does not permit a consideration of "the instructions as a whole," so we are unable to review the merits of Russo's instructional error contention.

## IV.  Disposition

The judgment is affirmed.

 

_____
Mihara, J.

WE CONCUR:

_____
Elia, Acting P. J.

_____
Bamattre-Manoukian, J.