Filed 5/29/25  Valdivia v. Ayala CA1/4

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| ADRIANA VALDIVIA,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ARMANDO AYALA,<br><br>Defendant and Appellant. | A169846<br><br>(Contra Costa County<br>Super. Ct. No. MSC2100076) |

This appeal stems from a dispute between appellant Armando Ayala, respondent Adriana Valdivia, and Valdivia's father, Martin Escamilla, who is not a party.  At the center of the dispute is ownership of a home in Contra Costa County (the Property).

For 14 years, Ayala and Valdivia lived together as a couple without marrying.  They had two children together and, in 2012, moved from a rental residence into the Property, which Ayala bought with a mortgage loan Escamilla co-signed.  Escamilla and Ayala were listed as co-owners of the Property on the deed.  In 2018, as Ayala's and Valdivia's relationship was falling apart, Escamilla transferred title to Valdivia.

Ayala, Valdivia, their two children, and an older child of Ayala's lived together as a family at the Property until 2019, when Valdivia moved out. Ayala, Valdivia, and Escamilla soon were embroiled in legal proceedings

1

regarding who owned the Property, with Valdivia seeking partition and Ayala cross-complaining against Valdivia and Escamilla on a variety of grounds. After an extensive bench trial, the trial court issued an interlocutory judgment of partition that determined Ayala to be the legal owner of the Property, but that also determined Valdivia and Ayala to be co-owners of the Property pursuant to an implied-in-fact contract they formed in 2012.

In support of these rulings, the court relied on the landmark case, *Marvin v. Marvin* (1976) 18 Cal.3d 660 (*Marvin*), and a follow-up case, *Milian v. De Leon* (1986) 181 Cal.App.3d 1185 (*Milian*). It also concluded that an accounting between Ayala and Valdivia regarding the Property was unnecessary in light of their co-ownership agreement, and that Valdivia should not be charged for the repayment of a COVID relief mortgage loan Ayala had obtained after the parties' cohabitation had ended.

Ayala now appeals. He contends the trial court's interlocutory judgment must be reversed because its ruling that Valdivia held a co-ownership interest in the Property pursuant to an implied-in-fact agreement is neither legally correct nor supported by substantial evidence. He also argues that in any event, the trial court should have ordered an accounting and charged Valdivia with half of the repayment of the COVID relief mortgage loan.

Seeing no merit in the appeal, we will affirm.

## I. BACKGROUND

In January 2021, Valdivia filed a complaint against Ayala for partition of the Property, an accounting, and an award of attorney's fees and costs. In her third amended complaint for partition of the Property, she alleged that she and Ayala had entered into "an oral cohabitation agreement as well as an

2

oral joint venture agreement" regarding the acquisition and ownership of the Property pursuant to which they each would own an undivided half-interest in the fee interest in the Property, notwithstanding that Escamilla initially held an undivided one-half interest as the ostensible co-owner in trust for Valdivia, which interest he later transferred to Valdivia. She sought a judgment partitioning the Property by sale, attorney fees and costs, a compensatory adjustment deducting certain COVID-related deferred mortgage obligations from Ayala's share of the net proceeds from the sale of the Property, and other compensatory adjustments then unknown but subject to proof at the time of trial.

In August 2021, Ayala filed a cross-complaint seeking to quiet title and for declaratory relief against Valdivia and Escamilla, as well as for breach of contract, fraud, and negligent misrepresentation against Escamilla.

The parties went to trial on Valdivia's third amended complaint and Ayala's cross-complaint. Ayala's appeal is from the court's ruling on Valdivia's third amended complaint for partition.

## A. *The Trial*

At trial, Valdivia, Escamilla, and Ayala each testified regarding their relationships, arrangements, agreements, and discussions with each other.

### 1. Valdivia's Testimony

Valdivia testified that she first lived with Ayala in a residence he rented in the Spring of 2005; that they moved to a second rental property in 2010; and that they then moved to the Property after its purchase in 2012, where they lived, unmarried, together until 2019. The couple had two children together—a girl, Mia, born in 2007, and a boy, Armando, Jr., born in 2010. Prior to 2013, Valdivia and Ayala also often took care of Ayala's minor daughter by another relationship, who lived with them starting in 2013.

3

From the beginning of their cohabitation until its end in May 2019, Ayala and Valdivia kept their money in separate bank accounts but shared in paying all of their family's expenses. Valdivia contributed to rental expenses, she testified, "[m]aybe not every month, but that was also not an explicit agreement that it would be monthly. It would be according to our income, him knowing my work situation and what that implied and vice versa." She also said, "The agreement was that, based on my income, I would take care of all the kids['] needs, diapers, day care, clothing, some utilities, and he would take care of the rent. So it was like teamwork, he would pool and I would pool our earnings to make our home run the way it did." "We were," she testified, "running a household together. . . . It was our family." She did 90 percent of the household food shopping, house cleaning, and laundry. They continued this same general arrangement after they moved into the Property.

At trial, Valdivia reviewed some of her payments for mortgage and household expenses as indicated in bank statements she had annotated to indicate what funds went to mortgage payments, home bills, and personal expenses. She said she gave Ayala personal checks or transferred cash to him for the mortgage. Between 2011 and 2015, when she was in school, he sometimes gave her cash for household expenses but did not after she started working full-time in 2015.

Until 2011, Valdivia worked at jobs outside the home. When their daughter Mia transitioned to pre-school, Valdivia testified, she and Ayala "both decided that was not in our best interest for me to continue to work because most of my work income would go into child care." Also, Ayala said he wanted her to stay home with the children. Valdivia did so, and also pet-sat, baby-sat, cleaned homes, and returned to school. In 2015, after completing school, she was hired full-time at the public charter school that

her children attended, which allowed her to continue to take care of them while working. Ayala worked at another school and operated his entertainment promotions business, in which Valdivia sometimes assisted without pay.

Valdivia twice loaned substantial amounts of money to Ayala that he did not pay back in full. In August 2005, at his request, she obtained a $12,802 loan that he used in his entertainment promotions business. He promised to pay her back in full, but gave her only between $5,000 and $8,000, including for payment of interest on the loan. She completed her payments on that loan in 2021. In 2011 she gave Ayala another $7,000, taken from her retirement fund, which he also did not pay back. She gave him the money because she thought "we were a team, and so whatever he or I did was for the benefit of the both of us and our three children."

Starting in 2011, Ayala and Valdivia began looking together for a home to purchase. Ayala could qualify for a $150,000 loan and Valdivia did not qualify at all for lack of a steady income. Valdivia's mother talked to Valdivia's father, Escamilla, about helping to increase the couple's buying potential. Ayala, Valdivia, and Escamilla agreed that Escamilla would co-sign a loan for two years and hold title for Valdivia until she and Ayala refinanced the loan together and removed him as co-signer. At trial, Valdivia agreed with Ayala's verified cross-complaint allegations that Escamilla "entered into this deal to help . . . [Valdivia] and her children have a secure place to live," and that also, "[i]n or around early 2012, [Valdivia] . . . agreed with [Ayala] that she would financially contribute to the expenses of the [P]roperty, including the mortgage payments." Valdivia testified that she agreed to contribute with the understanding that she was obtaining co-ownership in the Property.

5

With Escamilla as co-signer, Ayala was able to obtain a loan in excess of $250,000 and purchased the Property for about the amount of the loan. Although Valdivia did not contribute to the down payment or closing costs for the Property, nor sign any escrow instructions, she and Ayala "always had an implied agreement that," as she put it, "we both made contributions to the livelihood of the household to upkeep it, maintain, whether it was a rental or a home for purchase." "[W]e would each contribute . . . what we earned for the better and the upkeep of our household and the support of our family in any way, shape or form." Moreover, "when we purchased the home, we, with my dad's help, . . . qualified for a . . . much better house. However, it didn't mean we could afford it. So we took into account what we could afford mutually as it related to our income." Also, they had conversations prior to purchasing the house in which they agreed to enter into a joint venture regarding the Property.

The mortgage payments due on the Property began at around $1,400 to $1,800 and increased to $1,800 or $1,900 a month, where they remained at the time of trial. Valdivia and Ayala, based on their "mutual agreements and conversations," paid mortgage, taxes, insurance, and other Property-related expenses according to their respective abilities to pay. At trial, Valdivia identified four checks written between 2015 and 2018 as the checks she wrote to Ayala for the mortgage. She contended that she marked a check shown to her as payment for "rent" in late 2015 because there was "really no word for mortgage" in Spanish;[1] she marked another check shown to her as payment for "mortgage" in 2018. She also gave Ayala cash for the mortgage, as he asked her to give him cash, such as in February 2015 when she gave him

[1] On cross-examination, Valdivia acknowledged that "hipotecario" was Spanish for mortgage, but said it was very formal, so rarely used.

6

$500 one week and $1,000 another week. Around that time, she said, she tried to give Ayala at least $500 every month when he asked for money.

In 2017, the couple took steps to refinance the Property together, as first indicated by a September 2017 email a representative of a credit union where Valdivia had an account sent to both Valdivia and Ayala. As the representative requested, Valdivia and Ayala brought their pay stubs and tax returns to the credit union and met with the representative. She told them they would not qualify for a loan and advised them to create a joint account, wait a few months, and check their credit rating again, as having a bigger chunk of money flowing into one account would help them obtain a loan. Ayala became a joint owner of Valdivia's credit union account in order to improve their credit rating, but never deposited money into it.

Valdivia made improvements to the Property as part of her contribution to her co-ownership in the Property. She painted rooms, replaced bathroom flooring, did grouting, and installed a toilet and other fixtures. In 2018, she spent $8,000 to $10,000 (largely taken from a tax refund) to remodel the kitchen. She told Ayala what she had spent and did not ask him to contribute at that time.

In July 2018, Escamilla conveyed his one-half interest in the Property to Valdivia after telling her and Ayala he would do so.

Valdivia moved out of the Property in May 2019. After she left, Ayala led her to believe that he would keep paying the monthly mortgage payments in a timely fashion while he maintained exclusive possession of the Property. She later learned that he obtained 18 months of COVID-related mortgage relief totaling $36,730, which he was to pay later.

Valdivia also testified regarding a series of written exchanges she had with Ayala in 2020. In a January 2020 email, she wrote that an appraiser

7

had estimated the Property's value at $590,000, which would leave $374,000 in equity that, when split evenly between them, would give them each $187,000. Then, in September 2020, Ayala texted Valdivia to have the Property appraised so that he could determine how much belonged to her, which he would "take . . . from the house." She responded that she had already sent him an appraisal and stated, "I will not take less than half of the equity once it's sold slash refinanced. My dad also needs to come off the loan." He wrote back, "Yes, that's fine. I want to fix everything." She responded, "Okay."

As of the time of trial, Valdivia held the title interest Escamilla had conveyed to her and Escamilla remained a co-signer of the mortgage loan.

### 2. Escamilla's Testimony

Escamilla testified that in 2012, his wife persuaded him to co-sign for a $253,409 loan so that Valdivia, who was their daughter, and Ayala could purchase the Property. Ayala verbally agreed to pay all the mortgage payments, taxes, and insurance for the Property on time. Escamilla thought Ayala and Valdivia would be able to refinance the loan within two years.

Escamilla knew he and Ayala would be listed on the title deed as co-owners of the Property. He did not intend to keep his interest for himself but, rather, to help Valdivia obtain it, and expected she would be on the deed after she and Ayala refinanced the loan together. Ayala did not say he and Valdivia would refinance together at the time Escamilla co-signed, but he mentioned afterwards that, "[i]f they would refinance, she will be on the deed."

In February or March of 2018, Escamilla met with Ayala and told him he, Escamilla, was going to transfer his interest in the Property to Valdivia. This upset Ayala, who said Escamilla did not have a half-interest. Ayala and Valdivia were breaking up at the time.

### 3. Ayala's Testimony

Ayala testified that he was employed full-time as a lead campus supervisor and acting dean at a Catholic high school, where he had worked since he first met Valdivia. He also operated his own music entertainment business, which he began in 2000. Ayala could not write well in Spanish or English, but Valdivia wrote very well. She wrote some letters and contracts for him, for which he paid her in cash, but she did not work for his business.

When Ayala rented a house and Valdivia lived with him, he "was the one always paying everything. . . . So we never really talk[ed] about who's in charge of what." Valdivia "paid for groceries sometimes and she [paid] for stuff," but Ayala also paid for groceries. He always paid the utility bills, the rent, and, later, the mortgage. When Valdivia was working, she would buy groceries "[a]nd maybe . . . clothes for the kids, whatever they needed," including diapers and school expenses. He testified both that when he had "a little extra cash," he gave it to her to buy groceries or whatever she needed, more so when she was not working, and that he gave her "a lot of cash . . . whenever she wasn't working," and also that he supported her going to school. But, there was no understanding about who would pay for what. Also, he and Valdivia both did housekeeping tasks and cooking, and they both paid for the 2018 kitchen remodel.

When they lived together, Ayala and Valdivia kept separate bank accounts. He did not insist on separate accounts, it was just how they did things. He never talked with Valdivia about her or his money. When they had their second child together, they never talked about it not making sense for her to work outside the home because of the cost of child care, and he never insisted that she stay at home with the children. They never discussed the benefits of her working at the school that the children attended. He did not know how much money she made from her school job.

9

After renting for a while, Ayala and Valdivia looked for a house together that he would purchase. He did not tell Valdivia that she would not be a co-owner or a co-borrower with him, but he did not believe she thought they were buying a house together. They did not talk about it, as they were coming from renting a house that he paid for himself, and buying the house was the "same way."

After looking at several houses, Ayala and Valdivia saw the Property. It was nice, and it was available at a good price, but it cost more than the $150,000 loan Ayala could qualify for so he asked Escamilla for help. Escamilla said he would think about it and later agreed to co-sign for a mortgage loan after his wife talked to him, which she did after talking to Valdivia. Ayala promised Escamilla he would make timely payments and that, whenever he was ready, he would put the Property in his name. Escamilla did him a favor by co-signing, and there was no deal between them. Ayala could have asked members of his own family to co-sign, but he asked Escamilla because Escamilla's credit was good and Ayala trusted him a lot.

When Ayala purchased the Property, he signed a lot of papers, including the title deed, but nothing was explained to him. He "never thought [Escamilla] was on the title" until 2019, when he discovered Valdivia was on the title. He would not have purchased the Property if he knew Escamilla was going to co-own it because it was not fair for him, Ayala, to make all the payments. It was, he said, "my house."

Ayala purchased the Property to have a home for him and his family. Valdivia said she did not like the Property, but he said he was the one paying the mortgage and it was what he could afford. He never told Valdivia that she would be a half-owner.

There were times when Ayala was struggling financially and asked Valdivia for money, but it "could have been for other things not only for the house." He sometimes received checks from her but never cash, and did not pay attention to what she wrote in the memo section of her checks, such as "mortgage." But he also testified that Valdivia would "help" him sometimes by giving him cash, but only when she was working, which was rare, and that she gave him cash "here and there" when he was struggling, but that she did not give him money for the house.

Evidence was introduced showing that in most months in late 2015 and the first half of 2016, Ayala made deposits to his own bank, for the most part $500 to $600, shortly after Valdivia made withdrawals from her bank account or gave him checks for similar amounts. This also occurred regarding a few hundred dollars in November of 2017.

Ayala paid Valdivia back for the one loan she made to him, which was for $7,000. She never told him the loan should be counted towards a down payment on the Property.

In 2017, Valdivia convinced Ayala to go to her credit union to create a joint account because it was good for their credit and, Ayala testified, "good for me and her for the future, but . . . that's the only thing I understand." He went because he thought their relationship was still good, although he later learned it was not okay because she was seeing someone else at the time, so he felt "like it was set up for that." At the credit union, he and Valdivia talked "about refinance and making a loan for the house," but they did not see if they qualified for one. The credit union checked his and Valdivia's credit rating.

Ayala said he could not really explain why he put his name on Valdivia's account, and that he never deposited any money into it. They did

not discuss combining their income in one account to create a better credit record. He was confused about going to the credit union, other than knowing that Valdivia asked him to do it. He did not read the emails with the credit union representative when they were sent.

In February or March of 2018, Escamilla told Ayala he was going to transfer his title interest in the Property to Valdivia because the couple was not going to continue living together. Ayala told Escamilla he did not have a half-interest, and Escamilla told him that was why he had previously told Escamilla to put the Property in his own name before then. Ayala was upset by the conversation. Around that same time, Valdivia started saying she owned the house also.

In late 2019, Ayala qualified for a loan that would have enabled him to put the house in his name. Prior to the lawsuit being filed in early 2021, Ayala told Valdivia repeatedly that he would pay her money from whatever they could "pull out of the house" if her father would transfer the house to him. However, he testified, he did not want to sell the Property because he needed a place to live, and he did not agree to pay Valdivia a particular percentage; he also did not think she was a half-owner of the Property. When he responded in writing to her insistence that she receive half the Property's equity and her father be removed from the loan, "That's fine. I want to fix everything," it was because he was tired and wanted to fix things, and would have given her that kind of money if he could because she was the mother of his children.

Ayala said he signed a verification for his cross-complaint but did not read all of it because he trusted his attorney. He also had difficulty reading. A number of the cross-complaint's allegations were not true; for example, it stated that (1) Escamilla entered into a "deal" to help Valdivia and her

children have a secure place to live, but in fact he never heard Escamilla say that; (2) Escamilla agreed that when Ayala was able to refinance without a co-borrower, Escamilla would sign the necessary papers to allow Ayala to be solely responsible for the loan, but in fact Escamilla merely told him to put the house in his name when he was ready and to not be late on the payments and did not talk about "title"; and (3) Valdivia agreed with Ayala in 2012 to financially contribute to the Property's expenses, including with mortgage payments, but in fact she did not make such a promise and did not contribute anything to the Property's expenses.

Up to December 2022, Ayala made around $183,000 in mortgage payments for the Property. He received COVID-related mortgage relief in the form of the temporary suspension of his payment obligations, and told Valdivia about it at the time.

After the parties filed post-trial briefs, the trial court issued its tentative ruling, which it adopted as its final ruling after hearing argument.

First, the trial court found that the parties never contemplated Escamilla would own any *beneficial* interest in the Property, nor did they contemplate that his "nominal title" would serve as a proxy for Valdivia's title claim under *Marvin* and *Milian*. Further, Escamilla breached his agreement with Ayala by not transferring his interest back to Ayala but transferring it to Valdivia instead. The remedy for all of Ayala's claims related to these findings, the court concluded, was to quiet legal title in the Property for Ayala.

However, the court continued, none of these findings and rulings defeated Valdivia's claim for half-ownership of the Property. She could and did prove the parties had an implied-in-fact agreement giving her half-ownership, as supported by *Marvin* and *Milian*.

13

The court explained that Valdivia, to prove that claim, had to show an agreement specifically going to ownership of the Property and not just one to simply pool resources for day-to-day living expenses. The court continued, "[T]hat's really way, way more common than the case law seems to suggest it is. [¶] If you think about a couple who moves in together, . . . it would be really extraordinary, it would be scandalous and comment-worthy, for them, when they break up," to start going over who specifically paid for what. "That is why it is simply assumed in our society that, if a couple moves in together, in effect, they're going to have a *Milian* agreement to split . . . their expenses and not account for them later." Moreover, "it would probably call for comment on the part of the parties of, Oh, by the way, you are welcome to come move into my house, and we're a household together, and maybe we'll retire in our old age at age 70 together, but, in the meantime, here are the reasons why I'm going to be the owner of this house."

The court then turned to the particular circumstances of the case. It considered it "a close question in this case whether there was or was not an agreement for joint ownership." "Neither party gave much express thought" to who owned the Property at the time of its purchase. There was "no convincing evidence that the parties actually had that conversation one way or the other." But, the court noted, "[t]he fact that that conversation didn't occur, is in Sherlock Holmes' terms, the dog that didn't bark in the nighttime."

The court also found that "a number of facts are not readily reconciled with the hypothesis that [Ayala and Valdivia] both understood that Mr. Ayala would be the sole owner, and she would just help out, but that are reconcilable with the hypothesis, which I've called more the societal norm, that, when they go into a house together, they're going to end up co-owning

14

it." Specifically: (1) Valdivia contributed to the down payment on the Property "in the form of cleaning out her savings shortly before that, for a business loan, therefore, having no cash from which she could make a down payment, but enabling Mr. Ayala to make it from his own resources"; (2) all of the parties testified that they did not contemplate affording the mortgage for the Property without support from the income from both Ayala and Valdivia, which mortgage would not have happened if they had contemplated the Property was owned by Ayala only; (3) Valdivia made substantial payments to Ayala that Ayala used to pay the mortgage, and her reference to "rent" on some of her checks was merely meant to refer to housing expense; (4) Ayala and Valdivia interacted with the credit union in 2017 in order to take out a mortgage together, which necessarily implied that Valdivia was going to be on the ownership of the Property; (5) Valdivia's 2018 contributions financially and for the kitchen remodel, at a time when she was getting romantically involved with someone else and thinking about moving out, indicated she contemplated she had an ownership interest in improving the Property; and (6) the 2019 texts between Valdivia and Ayala were inconsistent with Ayala thinking he was the Property's sole owner because he said "that's fine" to Valdivia insisting on half the equity and that he would pay her what he could.

The trial court rejected Ayala's arguments that the couple's implied agreement failed for lack of specificity and consideration. The court was "not certain that a couple not planning for a breakup is likely to rise to your levels of specificity when it comes to the precise terms of the agreement," and it thought that under *Marvin* and *Milian*, "it suffices for them to agree in general that 'We are going to operate as an economically-unified household, kick in what we can, when we can, and own property together as we can.'"

15

The court ultimately ruled "that title will be quieted in Mr. Ayala's favor as against a record ownership by either Mr. Escamilla or Ms. Valdivia, Mr. Escamilla's assignee. [¶] However, I am finding that there is an implied contract to share the equity in the home on a 50/50 basis, after netting out the COVID relief."

The court said it would order that the Property be partitioned and sold, but would first give the parties an opportunity to negotiate another solution. It rejected Valdivia's request for attorney fees.

The court also rejected Ayala's request for an accounting. It concluded that the parties agreed to a 50/50 split of the Property without getting into respective contributions, citing *Milian*. As for post-cohabitation accounting, it noted "that it is usually the case that the parties figure that the interim expenses, after one party moves out, are essentially a wash against the value of occupancy." Ayala was "bearing the whole mortgage, but he's also getting the whole benefit of occupancy. That's what offsets against each other."

The trial court also ruled that Ayala was solely responsible for paying the approximately $36,000 in COVID mortgage relief he had obtained post-cohabitation. The court concluded this was in effect a second loan he had obtained for his own benefit; therefore, Valdivia would not be charged for any part of it.

The trial court subsequently issued an interlocutory judgment pursuant to Code of Civil Procedure section 872.720 that was consistent with its rulings at the hearing. The court expressly stated that Valdivia had proven her *Marvin/Milian* claim "by clear and convincing evidence" and, therefore, was "an equitable one-half owner of the [Property]." It further adjudged that Valdivia was entitled to a "compensatory adjustment pursuant to California Code of Civil Procedure §§ 872.120 and 872.140" of

16

$36,730.02 in the calculation of her equitable one-half interest in the Property.

Ayala filed a timely notice of appeal.[2]

## II. DISCUSSION

### A. *The Trial Court Did Not Err in Its Application of the Law Regarding Implied-in-Fact Contracts*

Ayala first argues the trial court made multiple legal and fact-finding errors in determining that the parties formed an implied-in-fact contract. According to Ayala, the court's explanations for its interlocutory judgment indicate it in effect imposed an improper presumption that Ayala and Valdivia co-owned the Property and switched the burden of proof from Valdivia to Ayala; improperly applied a lower burden of proof on Valdivia in multiple ways; and applied a "false dilemma" to the case. We disagree.

Before turning to Ayala's arguments, we note that Valdivia's appellate counsel has relied virtually entirely on the trial court's explanation for its rulings in countering Ayala's factual contentions rather than citing to evidence in the record. We do not condone such a practice, which places a great burden on this court to review the record on our own if we exercise our discretion to do so. " ' "It is the duty of a party to support the arguments in its briefs by appropriate reference to the record, which includes providing exact page citations." ' [Citation.] Because '[t]here is no duty on this court to

_____

[2] The court denied Ayala's request for a statement of decision as untimely. Normally, a statement of decision following a bench trial is considered "essential to effective appellate review" because it provides the "exact grounds upon which judgment rests." (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 982.) However, in certain circumstances, "even without a statement of decision, a judgment may nevertheless contain a satisfactory explanation of the trial court's reasoning." (*Alafi v. Cohen* (2024) 106 Cal.App.5th 46, 68.) Such is the case here given the trial court's extensive explanation of its interlocutory judgment.

search the record for evidence' [citation], an appellate court may disregard any factual contention not supported by a proper citation to the record." (*Grant-Burton v. Covenant Care, Inc.* (2002) 99 Cal.App.4th 1361, 1379, italics omitted.) Accordingly, we have disregarded factual contentions by Valdivia that are not supported by a record citation. Nonetheless, we have exercised our discretion to carefully review the record in order to determine whether Ayala, as the appellant, has met his burden of persuasion (e.g., *People v. JTH Tax, Inc.* (2013) 212 Cal.App.4th 1219, 1237), which he must meet regardless of the insufficient argument Valdivia has presented.

## 1. **Legal Standards**

### a. *Partition*

" 'A co-owner of real or personal property may bring an action for partition. (Code Civ. Proc., § 872.210.) "The primary purpose of a partition suit is . . . to partition the property, that is, to sever the unity of possession. [Citations.]" [Citation.]' [Citations.] . . . '[A]lthough the action of partition is of statutory origin in this state, it is nonetheless an equitable proceeding . . .' [Citation.]

" 'If the court finds that the plaintiff is entitled to partition, it shall make an interlocutory judgment that determines the interests of the parties in the property and orders the partition of the property and, unless it is to be later determined, the manner of partition.' ([Code Civ. Proc.,] § 872.720, subd. (a).)" (*Cummings v. Dessel* (2017) 13 Cal.App.5th 589, 597 (*Cummings*).) Among other things, "if the parties agree or the court concludes it 'would be more equitable,' the court may order the property sold and the proceeds divided among the parties. ([Code Civ. Proc.,] § 872.820; see [Code Civ. Proc.,] § 873.510 et seq.)" (*Id.* at p. 597.)

"The standard of review for an interlocutory judgment of partition is abuse of discretion." (*Cummings, supra,* 13 Cal.App.5th at p. 597.) Under

18

that standard, "[f]indings of fact are reviewed under a 'substantial evidence' standard." (*People v. Superior Court* (*Jones*) 18 Cal.4th 667, 681.)  Also, " '[a] disposition that rests on an error of law . . . constitutes an abuse of discretion.' " (*Cummings*, at p. 597.)

" 'The burden is on the party complaining to establish an abuse of discretion, and unless a clear case of abuse is shown and unless there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566.)  "A judgment or order of the lower court is *presumed correct*.  All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown." (*Id.* at p. 564.)

b.  *A* Marvin *Implied-in-Fact Contract*

In *Marvin*, our Supreme Court held that a non-marital partner "has the same rights to enforce contracts and to assert her equitable interest in property acquired through her effort as does any other unmarried person." (*Marvin, supra*, 18 Cal.3d at 684, fn. 24.)  As summarized by a later court, the *Marvin* court further determined " 'that in the absence of an express contract, the courts should look to the conduct of the parties to determine whether or not that conduct demonstrates "an implied contract, agreement of partnership or joint venture, or some other tacit understanding between the parties." ' " (*Velez v. Smith* (2006) 142 Cal.App.4th 1154, 1175 (*Velez*), quoting *Friedman v. Friedman* (1993) 20 Cal.App.4th 876, 883; *Marvin*, at p. 684.)

" 'Whatever else they may be, *Marvin* causes of action are . . . civil actions based on contract theory." (*Velez, supra*, 142 Cal.App.4th at p. 1176.) " '[E]ven as the nonmarital cohabitation does not erode the parties' contract

rights, neither does such cohabitation confer on them any special privilege over and above those of any other civil litigants.' " (*Ibid.*)

" '[T]he vital elements of a cause of action based on contract are mutual assent (usually accomplished through the medium of an offer and acceptance) and consideration. As to the basic elements, there is no difference between an express and implied contract. While an express contract is defined as one, the terms of which are stated in words (Civ. Code, § 1620), an implied contract is an agreement, the existence and terms of which are manifested by conduct (Civ. Code, § 1621).[3] . . . [B]oth types of contract are identical in that they require a meeting of minds or an agreement [citation]. Thus, it is evident that both the express contract and contract implied in fact are founded upon an ascertained agreement or, in other words, are consensual in nature, the substantial difference being in the mode of proof by which they are established [citation].' " (*Pacific Bay Recovery, Inc. v. California Physicians' Services, Inc.* (2017) 12 Cal.App.5th 200, 215.)

In other words, "[t]he contractual understanding need not be express, but may be *implied in fact*, arising from the parties' *conduct* evidencing their actual mutual intent to create such enforceable limitations." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 336 (*Guz*).) " '[T]he totality of the circumstances' must be examined to determine whether the parties' conduct, considered in the context of surrounding circumstances, gave rise to an implied-in-fact contract . . . ." (*Id.* at p. 337.)

A party who brings an action for the breach of an implied-in-fact contract regarding real property under *Marvin* must rebut by clear and convincing evidence the statutory presumption that a party holding legal title

---

[3] Civil Code section 1621 states, "An implied contract is one, the existence and terms of which are manifested by conduct."

to property is the owner of the full beneficial title. (Evid. Code, § 662; *Tannehill v. Finch* (1986) 188 Cal.App.3d 224, 227–228, followed in *Byrne v. Laura* (1997) 52 Cal.App.4th 1054, 1073 [this division concluding based on *Tannehill* that "[p]roof of a *Marvin* agreement for an interest in property contrary to record title must be made by 'clear and convincing' evidence"].)

" ' "The phrase, 'clear and convincing evidence' has been defined as 'clear, explicit, and unequivocal,' 'so clear as to leave no substantial doubt,' and 'sufficiently strong to demand the unhesitating assent of every reasonable mind.' " ' " (*People v. Martin* (1970) 2 Cal.3d 822, 833, fn. 14.)  It "demands a degree of certainty greater than that involved with the preponderance standard, but less than what is required by the standard of proof beyond a reasonable doubt." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 998.)  In other words, it requires a finding of " 'high probability.' " (*Ibid.*)

In *Milian*, which was a follow-up to *Marvin*, the parties, Milian and Sanchez, lived together in a long-term relationship, but never married; during their relationship, they purchased real property and took title as joint tenants, although only Milian lived in the property. (*Milian*, *supra*, 181 Cal.App.3d at pp. 1189–1190.)  After the couple broke up, Milian filed an action to quiet title in the property and for declaratory relief and Sanchez cross-complained for an undivided one-half interest in the property and a partition by sale. (*Id.* at p. 1191.)  The trial court rendered an interlocutory judgment of partition by sale, with the proceeds divided equally between the parties. (*Id.* at p. 1192.)  It ruled there was no need for an accounting because there was "an agreement between the parties to own and divide the property equally irrespective of the exact dollar contributions of each party to the purchase price or to the subsequent improvement, maintenance, or preservation of the property." (*Id.* at p. 1194.)

21

The appellate court affirmed. (*Milian*, *supra*, 181 Cal.App.3d at p. 1200.) It concluded that both parties "contributed significant financial resources and nonfinancial efforts to the acquisition of the home, furnishings, appliances, improvements, decoration and landscaping and, thus, had an implied agreement to jointly own the property. Quite clearly, they intended to own the property equally and there is substantial evidence that each was to contribute what he or she could and that both intended the property to be owned equally irrespective of inequality in the amounts contributed by each." (*Id.* at p. 1198.) It further explained, "[B]y definition joint tenancy ownership means equal ownership (see Civ. Code, § 683), and in the absence of an agreement for reimbursement we are unaware of any authority which authorizes reimbursement on account of unequal contributions to the down payment." (*Milian*, *supra*, 181 Cal.App.3d at p. 1195, fn. omitted.) Thus, "once the court in a partition action has determined that a true joint tenancy exists, it may not order reimbursement or contribution on account of differences in the amounts the parties have paid toward the initial acquisition of the property." (*Ibid.*)

## 2. The Court Did Not Apply an Improper Presumption or Switch the Burden of Proof

Ayala argues the trial court ruled that he and Valdivia had an implied-in-fact agreement to co-own the Property based on its application of an improper presumption and its reversal of the burden of proof from Valdivia to Ayala. He contends the court applied a presumption when it relied on the "societal norm" that couples living together are expected to have a *Milian* arrangement—meaning an agreement to share in such things as the ownership of property they purchase together without the need to account for related expenses later, and that the court shifted the burden of proof from Valdivia to Ayala as indicated by that characterization and this comment

22

that it made during argument regarding its tentative decision: "My problem is not so much that [Valdivia's] actions prove she's got a claim, it's that [Ayala's] actions prove that he doesn't." The court's comments, he contends, indicate it misapplied the holdings of *Milian* and *Marvin* to circumstances well beyond their intended reach.

Ayala's arguments fly in the face of a record that shows the trial court applied the correct standards in reaching its interlocutory judgment. The court's written judgment specifically states that Valdivia proved her *Marvin*/*Milian* claim "by clear and convincing evidence" and, therefore, was "an equitable one-half owner of the [Property]." This demonstrates the court's understanding that Valdivia had the burden of overcoming the presumption stated in Evidence Code section 662.

Moreover, Ayala neglects to grapple with the court's careful identification of numerous affirmative facts that support Valdivia's claim, further demonstrating its recognition that Valdivia, not Ayala, had the burden of proving her partition claim. Nor does Ayala give any weight to the trial court's explicit statement that it was *not* applying a presumption by its consideration of a "societal norm"; the court said: "I didn't quite mean presumed in the sense of a legal presumption. I said it was a societal norm, and one would expect parties agreeing to a less common arrangement, such as Mr. Ayala being the sole owner, to have said so."

Further, Ayala fails to appreciate that the trial court made the comments he criticizes when it was explaining its findings *as factfinder*. As such, it was entitled to consider its understanding, whether it characterized it as a "societal norm" or more plainly indicated it was its understanding from its own experience, of how cohabitating, committed couples generally

23

share in the assets and expenses they accumulate in the course of building a life together.

It almost goes without saying that our system of justice allows factfinders to consider the evidence based at least in part on their own experiences. As our Supreme Court has instructed, " '[W]e must allow . . . jurors to use their experience in *evaluating and interpreting* . . . evidence. Moreover, during the give and take of deliberations, it is virtually impossible to divorce completely one's background from one's *analysis* of the evidence. We cannot demand that jurors . . . never refer to their background during deliberations. "Jurors are not automatons." ' " (*People v. Allen and Johnson* (2011) 53 Cal.4th 60, 77, quoting *People v. Steel* (2002) 27 Cal.4th 1230, 1266, and citing *People v. Yeoman* (2003) 31 Cal.4th 93, 162 [jurors did not commit misconduct when they referenced their own experiences with drugs in evaluating the defendant's drug use, as " '[j]urors cannot be expected to shed their backgrounds and experiences at the door of the deliberation room' "], followed in *People v. Peoples* (2016) 62 Cal.4th 718, 777.)

Numerous areas of law necessarily recognize factfinders' reliance on their own experiences in considering evidence. For example, trial courts routinely determine whether to admit expert testimony based on whether or not the proffered testimony is "on a matter that is *within the common experience of lay jurors*. If the jurors would be able to draw a conclusion from the facts testified to as easily and as intelligently as the expert, the opinion testimony of the expert is not admissible." (*Westbrooks v. State of California* (1985) 173 Cal.App.3d 1203, 1210, italics added; see Evid. Code, § 801, subd. (a) [expert testimony is limited to opinions "[r]elated to a subject that is sufficiently beyond common experience that the opinion . . . would assist the trier of fact"].) And appellate courts have explained the meaning of the term

"reasonableness" as " 'discoverable *by reference to the common experiences of mankind as perceived by the factfinder.*' " (*People v. Superior Court (Sokolich)* (2016) 248 Cal.App.4th 434, 447, quoting *Guntert v. City of Stockton* (1974) 43 Cal.App.3d 203, 210–211, italics added.)

Courts acting as factfinders are, like jurors, permitted to rely on their own experiences in considering evidence. Thus, for example, in dependency matters, we recognize that "[w]hat constitutes the best interest of a child presents an inherently factual issue. [Citation.] . . . [T]his is 'an inquiry that is particularly founded *on application of the trial court's experience with human conduct.*' " (*Guardianship of A.L.* (2014) 228 Cal.App.4th 257, 268, quoting *Guardianship of L.V.* (2006) 136 Cal.App.4th 481, 488, italics added.)

Therefore, we have no concerns about the trial court's reference to a "societal norm" in explaining its decision here.

We also find nothing improper about the trial court's emphasis on Ayala's actions in determining there was an implied-in-fact agreement. The court immediately followed the comment Ayala cites ("My problem is not so much that [Valdivia's] actions prove she's got a claim, it's that [Ayala's] actions prove that he doesn't") with reference to Ayala's "conduct in several respects, starting with his accepting [Valdivia's] so-called rent checks, which nobody contends was really rent," and which the court found "is inconsistent with him saying, I'm the 100-percent owner, you get lost as far as owning this house goes." The court properly considered this evidence as part of its required review of the totality of the circumstances in determining whether the parties had entered into an implied-in-fact agreement to co-own the Property. (See *Guz, supra*, 24 Cal.4th at p. 337.)

The court also noted Ayala's failure to declare himself the sole owner of the Property at the time of purchase and other actions by Ayala—or more

25

properly stated, inactions—in reaching its decision. As we have discussed, a court may find an implied-in-fact contract based on a " ' "tacit understanding between the parties." ' " (*Velez, supra*, 142 Cal.App.4th at p. 1175; *Marvin v. Marvin, supra*, 18 Cal.3d at p. 684.) "By definition, tacit agreements are not concrete or explicit." (*Bell v. Bell* (2008) 512 F.3d 223, 245 [quoting the definition for "tacit" as " '[i]mplied but not actually expressed; implied by silence of silent acquiescence' " from the seventh edition of Black's Law Dictionary].) In such circumstances as those presented to the trial court, we agree that a party's inactions, including silence, can be telling.

In short, Ayala's improper presumption and switching of the burden of proof arguments lack merit.

### 3. The Trial Court Did Not Apply a Lower Standard of Proof in Finding an Implied-in-Fact Contract

Ayala also argues the trial court prejudicially applied a lower standard of proof in other ways to find Ayala and Valdivia had an implied-in-fact agreement to co-own the Property: he contends the agreement the court found to exist was in fact an illusory contract and did not meet the required elements of consideration and mutual assent.

While Ayala fashions these purported errors as legal in nature, his arguments in effect ask that we reweigh the evidence, which we are not permitted to do when reviewing for substantial evidence under an abuse of discretion standard. (*In re Harris* (2024) 16 Cal.5th 292, 319.) His arguments are unpersuasive for this and other reasons.

#### a. *Illusory Contract*

First, Ayala argues the trial court's implied-in-fact contract amounted to an illusory contract as demonstrated by the trial court's reasoning that, as Ayala characterizes it, "as long as the party claiming an equitable interest shows evidence that he provided some financial contribution to the household

26

(kicking in what he could) at some point (when he could), it seems he is entitled to an equitable interest in the property. Even contributing nothing at any time would ostensibly entitle him to such an interest if he claimed that that was the extent of his ability." Ayala relies primarily on *Mattei v. Hopper* (1958) 51 Cal.2d 119, which states that if a party is "free to perform or withdraw from the agreement at his own unrestricted pleasure, the promise is deemed illusory and it provides no consideration." (*Id*. at p. 122.)

Ayala's argument is unpersuasive for two reasons. First, Ayala's focus on the court's reasoning misses the purpose of our abuse of discretion review. "On appeal, . . . if a judgment is correct on any theory, the appellate court will affirm it regardless of the trial court's reasoning." (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956.) "[T]here is no abuse of discretion requiring reversal if there exists a reasonable or fairly debatable justification under the law for the trial court's decision or, alternatively stated, if that decision falls within the permissible range of options set by the applicable legal criteria." (*Id*. at p. 957.) As we will soon discuss in addressing Ayala's insufficient evidence arguments, we conclude that substantial evidence supports the trial court's rulings, whatever its reasoning.

Second, we have no issue with the trial court's reasoning. As it noted in rejecting Ayala's motion for judgment during the trial, agreeing to contribute financially what you can—which was Valdivia's characterization of her agreement with Ayala—may be "mushy around the edges," but it "doesn't make it illusory." Valdivia's testimony indicates, for example, that she and Ayala obligated themselves to make financial contributions to the mortgage whenever possible (and in fact did). Therefore, neither was free to withdraw from their agreement *without restriction* and the agreement, therefore, was

27

not illusory. Such contracting parties may dispute whether one of them may be able to contribute at any given time, but this is merely a garden-variety dispute regarding whether or not the contract has been breached. Ayala's argument amounts to that parties to a contract who agree to share financial burdens without setting fixed amounts for their financial contributions have entered into an illusory contract. This is incorrect under *Mattei*'s carefully worded instruction.

### b. *Lack of Consideration*

Ayala next makes three lack of consideration arguments.

"Any benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be suffered, by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor, is a good consideration for a promise." (Civ. Code, §1605.)

First, Ayala contends that Valdivia's testimony was essentially that she continued to contribute to the couple's expenses after the Property was purchased just as she had done before and, therefore, she provided no new consideration in return for co-ownership of the Property. We agree with the trial court's quick dismissal of Ayala's argument below: "I don't understand why not," the court said, explaining that an agreement to pay some of the newly assumed mortgage as part of a mutual commitment to share in the family's expenses was sufficient consideration to form a contract, regardless of whether Valdivia also had paid rent before the Property's purchase. We agree; as part of the purchase of the Property, a new obligation was taken on—a mortgage—and the evidence of Valdivia's commitment to help pay it is substantial evidence of consideration for co-ownership of the Property.

Second, Ayala contends there was no evidence that Valdivia and Ayala discussed using the $7,000 loan that Valdivia testified she gave to Ayala in

28

2011 from her retirement account, the year before the Property was purchased—one of the facts cited by the trial court in support of its ruling—and, therefore, the loan constituted inadequate past consideration only. (See *Steiner v. Thexton* (2010) 48 Cal.4th 411, 421 [valid consideration " ' "must actually be bargained for as the exchange for the promise" ' "].)

This argument misses the significance of this loan evidence. Valdivia's testimony indicates that the parties by their conduct demonstrated they had an agreement to share in all of their financial burdens, including the rent and the mortgage, both before and after the purchase of the Property. The court could reasonably infer Valdivia's loan was not necessarily consideration, but a part of this agreement and helped enable the couple to purchase the Property, particularly in light of the oversized mortgage loan Ayala obtained only with Escamilla's agreement to co-sign for it. Therefore, Ayala's past consideration argument is unpersuasive.

Third, Ayala argues the trial court improperly considered the substantial evidence of Valdivia's financial contributions to the care of the couple's children because it was her "legal duty" to take care of "her children" regardless of whether or not the Property had been purchased. We are perplexed by this argument. (See *Marvin, supra* 18 Cal.3d at p. 670, fn. 5 ["[a] promise to perform homemaking services is, of course, a lawful and adequate consideration for a contract"].) While Valdivia had a legal duty to care for the children, Ayala, their father, did as well. The trial court could reasonably consider this evidence in determining that the parties had agreed to share all the financial burdens of their family, whether one of them paid the mortgage and one of them paid the child-related expenses at any given time. Valdivia's "legal duty" is irrelevant to that legitimate analysis.

29

c. *Mutual Assent*

Ayala also argues there was no evidence of the parties' mutual assent to an implied-in-fact contract to co-own the Property. Curiously, he ignores the substantial evidence cited by the trial court in support of its ruling, merely contending that "Valdivia did not allege an implied in fact contract. She testified to an oral agreement between her and Ayala. She was, however, unable to articulate definitive formation of a contract. She was unable to testify as to when and where the contract was formed, what the offer was and what was the acceptance." This argument is unpersuasive for multiple reasons.

First, Valdivia raised her implied-in-fact contract theory prior to trial, stating in her trial brief that the court should apply the contractual and equitable principles articulated in *Milian* and *Marvin* and specifically referring to what she characterized in *Marvin* as "the oral, implied agreement between the parties to pool their earnings and personal services for the benefit of sustaining family home and home life." The trial court considered these arguments without objection from Ayala, who does not on appeal contest its right to have done so.

Second, Valdivia, while she testified that she had an express oral agreement with Ayala to own the Property together, also testified that she had an implied agreement with Ayala. She specifically said that "we always had an implied agreement that we both made contributions to the livelihood of the household to upkeep it, maintain, whether it was a rental or a home for purchase." Asked to explain this agreement further, she testified, "So we would each contribute our funds what we earned for the better and the upkeep of our household and the support of our family in any way, shape or form." "The uncorroborated testimony of one witness can constitute substantial evidence, unless the testimony is inherently unreliable." (*Plastic*

30

*Pipe & Fittings Assn. v. California Building Standards Com*. (2004) 124 Cal.App.4th 1390, 1407, citing Evid. Code, § 411 and *People v. Scott* (1978) 21 Cal.3d 284, 296, and followed in *TRC Operating Co., Inc. v. Chevron USA, Inc.* (2024) 102 Cal.App.5th 1040, 1106.) Ayala gives us no reason to conclude Valdivia's testimony was inherently unreliable; accordingly, it is substantial evidence of such an agreement.

Valdivia's testimony also effectively undermines Ayala's contention that Valdivia was unable to articulate the definitive formation of a contract. As we have discussed, the focus of any inquiry into whether parties entered into an implied-in-fact contract is on the parties' *conduct*, and does not necessarily require evidence that they engaged in any particular discussion of their agreement. The conduct Valdivia described, and other conduct cited by the trial court (which we will soon discuss in some detail again when we discuss Ayala's insufficient evidence arguments), constitute substantial evidence of an implied agreement to co-own the Property.

### 4. The Court's Reasoning Did Not Pose a False Dilemma

Finally, Ayala argues the trial court based its reasoning on a false dilemma, as evidenced by its hearing statement that "[t]he question that this cases presents, and *Milian* did not—and neither did *Marvin*—is whether that agreement also includes the feature that when they decide to buy a house, they're going to buy it together, as opposed to one being the landlord and the other being the tenant." Ayala contends this binary "false dilemma" reasoning favored Valdivia and ignored the possibility that Valdivia was neither a co-owner nor a renter, but was similar to a college student who moves in with his parents after graduation without paying rent or a man who moves into a dating partner's condominium after getting a job nearby. In none of those situations, Ayala contends, would the non-owner be entitled to an ownership interest in the relevant property.

This argument is unpersuasive because, first, it also focuses on the court's reasoning when our task is to look for substantial evidence in support of the court's ruling regardless of its reasoning. (*Cahill v. San Diego Gas & Electric Co.*, *supra*, 194 Cal.App.4th at pp. 956, 957.) Second, we have no quarrel with the trial court's reasoning in light of the substantial evidence that Valdivia gave substantial amounts of money in the form of checks or cash to Ayala for the mortgage, at least one of which she characterized as "rent' in the memo section of the check. The court's comment merely reflected the state of the evidence before it.

## B. *Substantial Evidence Supports the Trial Court's Finding of an Implied-in-Fact Contract*

Ayala next challenges the trial court's conclusion that he and Valdivia had an implied-in-fact agreement to co-own the Property as unsupported by substantial evidence.

As we have discussed, under an abuse of discretion standard, "[f]indings of fact are reviewed under a 'substantial evidence' standard," which "is deferential: 'When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination . . . .' " (*People v. Superior Court* (*Jones*) (1998) 18 Cal.4th 667, 681 (*Jones*).)

Substantial evidence is not " ' " 'any' evidence," ' " but " ' "must be reasonable in nature, credible, and of solid value; it must actually be 'substantial' proof of the essentials which the law requires in a particular case." ' " (*Jones*, *supra*, 18 Cal.4th at p. 681, fn. 3.) Also, " '[a] disposition that rests on an error of law constitutes an abuse of discretion. [Citations.]' " (*Cummings, supra*, 13 Cal.App.5th at p. 597.)

In support of his argument, Ayala contrasts the substantial evidence in this case with that discussed in certain other cases regarding implied-in-fact contracts. He delineates a number of non-exclusive factors considered by courts such as *Alderson v. Alderson* (1986) 180 Cal.App.3d 450, a case in which a former unmarried couple who had held themselves out as married disputed ownership of certain rental properties, and *Maglica v. Maglica* (1998) 66 Cal.App.4th 442, 456, such as direct testimony of an agreement, the couple's holding of themselves out as husband and wife, the woman and children's taking of the man's surname, pooling of finances to purchase joint rental properties, joint decision-making in rental property purchases, and work to pay bills and collect rents for the properties. (*Ibid.*)

Ayala also writes: "In *Alderson v. Alderson*, . . . the plaintiff testified that her part of the consideration was to be the defendant's wife and to do 'whatever a wife does.' She testified that 'if you took one specific thing away, there [were] so many other things that we both did, one wouldn't make any difference, or two or three.' (*Alderson* at 463.) In contrast, Valdivia was unable to point to anything more than 'buying groceries' and clothes for her children as her supposed consideration for the alleged agreement between herself and Ayala. . . . Valdivia herself affirmed that she was caring for her children, buying them food and clothing not only because she is a good mother, but 'because it's an obligation,' " and, therefore, a legal duty that that cannot constitute consideration for the implied-in-fact agreement the court found. He adds, "In *Della Zoppa*[ *v. Della Zoppa* (2001) 86 Cal.App.4th 1144], . . . the court of appeal noted that plaintiff's agreed-upon responsibilities included 'such matters as preparing meals, managing the home generally, arranging for remodeling, including arranging for new carpeting, furniture,

artwork and appliances in, and painting of, the home,' as well as 'a commitment to try to "have a family." ' "

Ayala contends that in contrast, "the sole factor considered here by the finder of fact was Valdivia's 'direct testimony of an agreement. Such is insufficient evidence on which to determine the existence of an implied agreement share property. Furthermore, Valdivia did not testify of an implied agreement. On the contrary her testimony was focused on the purported oral agreement which was alleged in the [third amended complaint]." He then goes on to argue that specific factual findings by the court are not supported by substantial evidence.

Ayala's general contentions are not supported by the record or the law. As we have already discussed, the testimony of Valdivia that the trial court relied on, whether the testimony was corroborated by other evidence or not, constitutes substantial evidence in the absence of any evidence that it was inherently unreliable. (*Plastic Pipe & Fittings Assn. v. California Building Standards Com.*, *supra*, 124 Cal.App.4th at p. 1407, citing Evid. Code, § 411 and *People v. Scott*, *supra*, 21 Cal.3d at p. 296, and followed in *TRC Operating Co., Inc. v. Chevron USA, Inc.*, *supra*, 102 Cal.App.5th at p. 1106.) Putting aside for the moment that Valdivia did present some corroborating evidence (such as checks she wrote to Ayala, an email from a representative at her credit union, and, after they broke up, written exchanges with Ayala about disposition of the equity in the Property), and that Ayala testified to conduct by himself (such as regarding the credit union and his willingness to pay Valdivia at least some of the equity accumulated in the Property) that supports the court's finding of an implied-in-fact agreement, Ayala cites neither evidence nor law that supports his contention that Valdivia's testimony was insufficient evidence. While she testified that she had an

34

express agreement with Ayala to own the Property together, she also testified in some detail that she and Ayala always had "an implied agreement that," as she put it, "we both made contributions to the livelihood of the household to upkeep it, maintain, whether it was a rental or a home for purchase." "[W]e would each contribute . . . what we earned for the . . . support of our family in any way, shape or form." We conclude her testimony is substantial evidence in support of the court's ruling.

We also find no merit in Ayala's challenges to the trial court's specific factual findings. And when those findings are considered, it becomes clear that there is substantial evidence that Valdivia's contributions to the family she shared with Ayala, including its financial burdens, were more similar than not to those discussed in *Alderson*, *Maglica,* and *Della Toppa*.

First, Ayala argues there is no substantial evidence that Valdivia made contributions to the down payment of the Property by her $7,000 loan to Ayala the year before the Property's purchase, which helped make it possible for Ayala to make the down payment from his own funds. We have already discussed why this testimony is substantial evidence in support of the trial court's decision.

Second, Ayala argues there is no substantial evidence to support the trial court's finding that the mortgage was taken on with the parties understanding they needed their two incomes to pay it. This is incorrect. As we have already discussed, Valdivia specifically testified, "when we purchased the home, we, with my dad's help, we qualified for a . . . much better house. However, it didn't mean we could afford it. *So we took into account what we could afford mutually as it related to our income*." (Italics added.) Further, Ayala acknowledged in his trial testimony that he was unable to purchase the Property without Escamilla's co-signing of the

mortgage loan, and that there were times when he struggled financially and accepted money from Valdivia. The trial court could reasonably infer from his testimony that the couple understood when they purchased the Property that the mortgage was a stretch for Ayala to pay without Valdivia contributing to the couple's expenses, including the mortgage itself, as part of an implied agreement to jointly pay for all of their family's expenses.

Third, Ayala argues the trial court's finding that Valdivia made "substantial" financial contributions to the Property because, he contends, she paid merely $32,000 of the over $180,000 Ayala paid from the time of purchase to the time of trial, a mere 16 percent of the total. "Even pairing this with grocery shopping," Ayala continues, "it still does not constitute conduct consistent with, or sufficient to prove, an implied contract to share equally in the real property."

We disagree with Ayala that the mortgage contributions by Valdivia that he cites were not substantial, given that they were in the tens of thousands of dollars. But moreover, Ayala's characterizations are based on a highly selective reading of the record that ignores other substantial contributions Valdivia testified that she made in the course of the couple's cohabitation. This include her testimony that she took care of all the children's needs; did 90 percent of the household shopping, house cleaning, and laundry; agreed at Ayala's request to stay at home with the children rather than work outside the home; assisted Ayala in his entertainment promotions business without pay; twice prior to the purchase of the Property loaned Ayala thousands of dollars; and made numerous improvements to the Property, including but not limited to the 2018 kitchen remodel. This is substantial evidence of her substantial contributions. It supports Valdivia's

36

main point that she and Ayala shared jointly in all of their family needs and expenses.

Fourth, Ayala contends that neither Valdivia's "beliefs" of ownership nor her contributions to the 2018 kitchen remodel are evidence of her co-ownership in the Property. While we agree that Valdivia's beliefs alone are insufficient to show an agreement, there is ample, substantial evidence of conduct that supports her co-ownership, as our discussion indicates.

As for the 2018 kitchen remodel, Ayala contends that the evidence "strongly suggests" Valdivia began investing in the remodel only after learning that her father, Escamilla, was going to transfer his ownership interest to her. That and related evidence, he contends, creates the inference that Valdivia paid for the remodel not because she always thought she had an ownership interest, but because she understood by Escamilla's transfer of his interest that she soon would have one.

This argument is unpersuasive as nothing more than a request that we reweigh the evidence, which, as we have indicated, we cannot do when reviewing for substantial evidence. (*In re Harris*, *supra*, 16 Cal.5th at p. 319.) It is also not the only reasonable inference that can be made from the evidence. The trial court reasonably inferred from the evidence that, as it stated at the hearing, "[t]he 2018 contributions, both financial and in work to improve the kitchen, at a time when Mr. Ayala makes the point, probably correct, that she was getting romantically involved with someone else and thinking of moving out, she's got no reason to do that if she doesn't contemplate that she has an ownership interest in improving the property."

Fifth, Ayala contends that adding his name to Valdivia's credit union account in 2017 was not evidence of an implied-in-fact contract to co-own the Property and, even if it were, it is not sufficient by itself or with the other

37

evidence to support the trial court's implied-in-fact contract finding. He notes that Ayala never used the account, that the couple never actually applied to refinance the mortgage, and that, as the trial court acknowledged, Ayala waffled in his testimony, making it unclear that he wanted Valdivia on the mortgage. Once, more, Ayala is simply asking that we improperly reweigh the evidence. The trial court reasonably inferred from both Valdivia's and Ayala's testimony about their credit union activities that the couple shared an intention to refinance and, by doing so, put Valdivia on the mortgage loan, thereby indicating an understanding that they co-owned the Property.

## C. *Ayala Does Not Show the Trial Court Erred in Concluding an Accounting Was Unnecessary*

Finally, Ayala argues the trial court erred in failing to order an accounting for what he and Valdivia spent during their cohabitation and afterwards related to the Property.

In its interlocutory judgment, the court ruled that Valdivia was not responsible for paying any of the approximately $36,000 in COVID relief Ayala obtained post-cohabitation, citing as authority for its ruling Code of Civil Procedure sections 872.120 and 872.140. Ayala does not contest the application of those statutes here.

Code of Civil Procedure section 872.120 provides, "In the conduct of the action, the court may hear and determine all motions, reports, and accounts and may make any decrees and orders necessary or incidental to carrying out the purposes of this title and to effectuating its decrees and orders." Code of Civil Procedure section 872.140 provides, "The court may, in all cases, order allowance, accounting, contribution, or other compensatory adjustment among the parties according to the principles of equity."

In other words, contrary to Ayala's assertion that the trial court was required to conduct an accounting, it had permissive statutory authority to do so, i.e., the word "may" as used in these statutes indicates it had the discretion to order an accounting but was not required to do so. (*People v. Moine* (2021) 62 Cal.App.5th 440, 448 [a statute that delineates the trial court's authority by use of the word "may" gives "the trial court . . . broad discretion"], citing *People v. Lockwood* (1998) 66 Cal.App.4th 222, 227 [when interpreting statutes, "[i]n general, . . . the word 'may' connotes a permissive standard as compared with the mandatory nature of the word 'shall' "].)

It appears the trial court found that Ayala and Valdivia were co-owners of the Property as joint tenants, as it twice referred to that arrangement in framing the question before it, although its final oral and written rulings do not expressly refer to a joint tenancy. Ayala argued below and argues on appeal that the arrangement was at best between tenants in common and that, given that arrangement, the court should have ordered an accounting. The trial court rejected this argument, concluding the parties agreed to a 50/50 split of the Property without getting into respective contributions, citing *Milian*.

As for a post-cohabitation accounting, the court noted "that it is usually the case that the parties figure that the interim expenses, after one party moves out, are essentially a wash against the value of occupancy." Ayala was "bearing the whole mortgage, but he's also getting the whole benefit of occupancy. That's what offsets against each other."

The court's rulings are supported by the substantial evidence we have discussed that the parties' implied-in-fact agreement included that they would share in all family needs and expenses without division between them, which evidence the court plainly endorsed in its ruling. Ayala gives us no

39

legitimate reason to second-guess the court's endorsement of that substantial evidence, regardless of whether the parties are co-owners of the Property as tenants in common or as joint tenants.

Ayala argues that as a matter of law, the court erred in finding that the parties held co-ownership of the Property as joint tenants because a joint tenant agreement must be in writing pursuant to Civil Code section 683, subdivision (a),[4] citing *Estate of Seibert* (1990) 226 Cal.App.3d 338, 342. But nowhere does the record show that Ayala preserved this argument for appeal by raising it below. Therefore, the argument has been forfeited. (*Meridian Financial Services, Inc. v. Phan* (2021) 67 Cal.App.5th 657, 699–700 [" 'Whether an appellate court will entertain a belatedly raised legal issue always rests with the court's discretion.' "].) In any event, this division in another equitable proceeding involving circumstances similar to those before us, disagreed with *Estate of Seifert* and concluded that a party was not necessarily estopped from asserting that a joint tenant agreement had to be in writing. (*Byrne v. Laura*, *supra*, 52 Cal.App.4th at pp. 1069–1070.) Ayala does not discuss, and gives us no reason to disagree with, that conclusion.

Ayala further argues that, even if we conclude that no accounting is necessary for what he and Valdivia spent during their cohabitation, the trial

---

[4] Civil Code section 683, subdivision (a) states: "A joint interest is one owned by two or more persons in equal shares, by a title created by a single will or transfer, when expressly declared in the will or transfer to be a joint tenancy, or by transfer from a sole owner to himself or herself and others, or from tenants in common or joint tenants to themselves or some of them, or to themselves or any of them and others, or from spouses, when holding title as community property or otherwise to themselves or to themselves and others or to one of them and to another or others, when expressly declared in the transfer to be a joint tenancy, or when granted or devised to executors or trustees as joint tenants. A joint tenancy in personal property may be created by a written transfer, instrument, or agreement."

court should have ordered an accounting for what they spent after it ended, given that their implied agreement was premised on their co-habitation.  He argues that in this respect the *Milian* court got it wrong.  Among other things, he asserts without further explanation that, "[b]eing entitled to reimbursement, [Ayala], moreover, should not be required to have $36,000 come out of his portion of the proceeds and given to Valdivia.  The note should be paid prior to a division of the proceeds of a sale between Ayala and Valdivia."

  This argument is also unpersuasive.  We need not determine whether or not *Milian*'s holding was incorrect because Ayala fails to grapple at all with the actual reasons the trial court gave for concluding an accounting for this post-cohabitation period was unnecessary.  These were "that it is usually the case that the parties figure that the interim expenses, after one party moves out, are essentially a wash against the value of occupancy," which was held by Ayala, and because Ayala owed the $36,000 as a result of receiving COVID-related mortgage relief from the bank that was solely to his benefit.  Because Ayala has failed in his burden as appellant of affirmatively showing the court erred in making the actual findings that are the basis for its decision, his argument fails.  (*Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 655 ["the trial court's judgment is presumed to be correct, and the appellant has the burden to prove otherwise by presenting legal authority on each point made and factual analysis, supported by appropriate citations to the material facts in the record; otherwise, the argument may be deemed forfeited"]; (*Denham v. Superior Court, supra*, 2 Cal.3d at p. 564 ["A judgment or order of the lower court is *presumed correct* . . . and error must be affirmatively shown."].)

## III. DISPOSITION

The judgment is affirmed.  Valdivia is awarded costs of appeal.

STREETER, Acting P. J.

WE CONCUR:

GOLDMAN, J.
SIGGINS, J.*

---

\* Retired Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.